# Richmond

## Dennis McMurray and Martha McMurray v. Commonwealth.

### September 17, 1925.

1. Homicide—*Murder in the Second Degree—Evidence Sufficient to Sustain Conviction.*—In the instant case it was assigned as error that the trial court refused to set aside the verdict of the jury as contrary to the law and the evidence. The evidence was conflicting. Many of the witnesses were hostile to each other, or towards the defendants and their families, or the deceased and his family, and the immediate parties to the homicide were not on good terms with each other; but the evidence for the Commonwealth was abundant to support the verdict of the jury, which was for murder in the second degree.

2. Homicide—*Threats—Connection of Threats with Deceased—Case at Bar.*—In the instant case a witness for the Commonwealth was asked whether she had heard one of the defendants make any threats against the deceased, and she answered, over the objection of the defendants, that on the day before the killing of deceased I went to the mail box with the defendant in question, and defendant stated that "they were going to fence that lot up there but she expected to have trouble. She never mentioned anyone's name." This testimony was objected to on the ground that deceased was not mentioned, and that there was nothing to indicate what was meant by the expression, "looked for trouble." The families of the accused and deceased were on unfriendly terms. Both parties claimed possession of the lot in question, and according to the testimony for the Commonwealth, the accused attacked deceased with an ax at the place where the accused "looked for trouble," and accused stated to one witness: "Yes, I guess we have killed him, but we had it to do."

Held: That, under these circumstances, the trial court committed no error in permitting the statement of the witness to go to the jury.

3. Homicide—*Threats—General Threats.*—A mere general threat, referring to no particular person, is not admissible in evidence, unless the accused be, in some way, connected with it, and the burden is on the Commonwealth to show the connection; but the connection may sufficiently appear from the circumstances, or subsequent declarations of the accused, and if the circumstances are such that the language used might reasonably be construed to include or refer to

the deceased or injured person, the evidence should be admitted and the question left to the jury.

4. HOMICIDE—*Appeal and Error—Threats—Harmless Error.*—In a prosecution for homicide the testimony of a witness as to a threat made by one of the defendants against deceased was objected to on the ground that the date of the threat was not given. While the witness was on the stand the accused could easily have asked the date, but did not do so. Even if this was error, it was harmless, as similar threats shortly before the homicide were proved by several other witnesses.

5. HOMICIDE—*Evidence—Possession of Land in Controversy.*—On a prosecution for homicide where the difficulty between accused and deceased arose out of their claiming possession of the land where the homicide occurred, accused testified that they had been in possession of the land in controversy for twenty-seven or twenty-eight years, and had cultivated it and cut and sold wood from it. The Commonwealth, over the objection of the accused, was permitted to show by several witnesses, in rebuttal, that the land had not been in cultivation during that time.

   *Held:* That in this there was no error.

6. HOMICIDE—*Deadly Weapon—Instructions—Harmless Error.*—In a prosecution for homicide the court instructed the jury that "a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation, or even with slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the prisoners the necessity of showing extenuating circumstances." It was objected to this instruction that there was no evidence to support it, as the weapons used were an ax in the hands of one of the accused and a stick in the hands of the other, picked up during the fight.

   *Held:* That if it were conceded that the instruments of death were not in the previous possession of the accused, within the meaning of the law, there was still the unrebutted presumption arising from an intentional homicide, and also the evidence in the case of the circumstances of the killing; and as the verdict was for murder in the second degree, the error, if any, in the instruction was harmless.

7. HOMICIDE—*Presumptions and Burden of Proof—Murder in the First and the Second Degree.*—Every intentional homicide is presumed to be murder of the second degree, and the burden of elevating it to murder of the first degree is on the Commonwealth, and of reducing it to manslaughter or excusable homicide is on the accused.

8. HOMICIDE—*Presumptions and Burden of Proof—Deadly Weapon—Previous Possession of Weapon.*—Every person is presumed to have intended the natural and probable consequences of his voluntary acts. The test of the criminal intent in the use of a deadly weapon is to be found, not in the manner in which or the purpose for which

the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose. The "previous possession" is not to be understood as a possession originating in previous preparation for the crime.

9. HOMICIDE—*Instructions—Refusal of an Instruction for Accused not Erroneous in View of One Given in Lieu Thereof by the Court.*—In the instant case, a prosecution for homicide, the court refused to give an instruction asked for by accused, and in lieu thereof gave another instruction. The difficulty resulting in the homicide arose out of a controversy between the parties as to the title and possession of a lot of land. The object of both instructions was to tell the jury that the rights of the parties were not to be determined by the actual title or right of possession, and to present the doctrine of retreat. Neither instruction plainly told the jury what the doctrine of retreat was, and while the instruction tendered by the defendants correctly stated the law, the instruction given conformed more nearly to the facts of the case and embraced substantially the same proposition propounded by the defendants.

*Held:* That the trial court committed no error in giving the substituted instruction.

10. HOMICIDE—*Argument of Counsel—Unimportant Statement of Counsel.*— In the instant case an expression of an opinion by the Commonwealth's attorney as to why a witness at some distance from the affray "turned her back" during the altercation could not have affected the verdict, and was therefore harmless.

11. NEW TRIALS—*Newly Discovered Evidence—Evidence in Impeachment.*— In the instant case, a prosecution for homicide, the trial court did not err in refusing to set aside the verdict of murder in the second degree on the ground of after discovered evidence, where all of the evidence so offered was merely to impeach or contradict the chief witness for the Commonwealth.

12. HOMICIDE—*Joint Defendants—Question as to Who Struck the Mortal Blow—Acceleration of Death—Case at Bar.*—In the instant case, a joint trial of defendants for murder, the testimony for the Commonwealth tended to show that the defendant, M., first struck the deceased with an ax and that as he began to sink defendant, D., struck him across the side of the head with a club. From this it was argued that a verdict of guilty against M. should be set aside. The same witness who testified that the last blow was given by D., also testified that it was a joint assault by the two defendants on the deceased.

*Held:* That the law relating to the acceleration of the death of one who has received a mortal wound by an independent act of another was not applicable. It was immaterial which of defendants struck the last blow. They were both guilty as principals.

Error to a judgment of the Circuit Court of Scott county.

*Affirmed.*

The opinion states the case.

*W. S. Cox* and *Will H. Nickels*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Lewis H. Machen, Assistant Attorney-Generals*, for the Commonwealth.

Burks, J., delivered the opinion of the court.

The plaintiffs in error, defendants in the trial court, were jointly indicted, tried and convicted for the murder of W. C. McMurray, and sentenced to the penitentiary for fourteen years.

Dennis McMurray, one of the defendants, was the son of Martha McMurray, the other defendant, and the nephew of W. C. McMurray, the deceased.

[1] It is assigned as error that the trial court refused to set aside the verdict of the jury as contrary to the law and the evidence. The evidence is as conflicting as it could well be. Many of the witnesses were hostile to each other, or towards defendants and their families, or the deceased and his family, and the immediate parties to the homicide were not on good terms with each other; but the evidence for the Commonwealth was abundant to support the verdict of the jury, which was for murder of the second degree.

The immediate cause of the difficulty was the attempt of the defendants to enclose a small piece of land claimed by both the deceased and the defendants. The testimony in chief of I. F. Ramey, a witness for the Commonwealth, was as follows:

"I live on Timbertree branch in Scott county, Va. I knew W. C. McMurray in his life time and am acquainted with the defendants. W. C. McMurray was killed by the defendants in Scott county, Va., on May 18, 1923, about 2 or 2:30 o'clock in the afternoon. I was working planting corn about 123 steps from the parties. I afterwards stepped it. I was on the hill above them. My son-in-law, Willis McMurray, and my daughter were with me. The first thing that I heard or attracted my attention was I heard W. C. McMurray say to the defendants, 'get off of my land and get off now,' and I looked and saw W. C. McMurray crossing the creek and when he got across the creek he pulled up the second post from the corner that Martha and Dennis McMurray had driven up and threw it down, and he then went to the corner post and pulled it up, or was trying to pull it up, and I saw Martha McMurray go and get the ax which was about four panels from where W. C. McMurray was. She got the ax and Dennis McMurray got a club, or a large chestnut pole, and they both rushed on W. C. McMurray who had a post in his hands which he was waiving around towards Martha McMurray like he was trying to keep her off, and he backed off up the hill and Martha and Dennis were following him to a bluff or steep place where there were bushes and briars growing and he could not get any further. W. C. McMurray then pushed or shoved Martha McMurray down and rushed out by them down into the little bottom and Dennis and Martha followed him. Dennis had the club and Martha the ax. W. C. McMurray reached the ax out of Martha's hand and was motioning with the ax as if he was trying to ward off Dennis' club. I got on the ground at that time and got in between Dennis and W. C. McMurray and told them that that was no way to settle business and I put

my hand on W. C. McMurray's shoulder and he pitched the ax off up the hill behind him. I took my eye off of Martha McMurray and was watching Dennis who had the stick raised, and about that time I felt W. C. McMurray's body jar and I looked around and Martha McMurray was behind him with the ax drawn back in a striking position. I grabbed the ax out of her hands and threw it up the hill. Just as I felt the jar on W. C. McMurray's body he began to sink down and when he had gotten nearly to the ground Dennis struck him across the side of the head with a club, and raised the club to make a second lick and I struck Dennis McMurray across the head with a hoe handle which I had in my hands, and which I had carried with me from where I was planting corn. I had the hoe in my hand when I saw the difficulty begin and I carried it I suppose unconsciously with me. (Here the ax and club were introduced to the jury.) Martha McMurray was standing on a little higher ground than W. C. McMurray was when he was struck. When I struck Dennis McMurray with a hoe I then went to my house which was a short distance away. At the time of the difficulty W. C. McMurray, Dennis McMurray, Leo Cross were the only ones that were present. My wife arrived on the ground some time during the difficulty. After W. C. McMurray was struck and just about the time I was leaving for my house, I saw Lola McMurray, wife of Dennis McMurray, coming from the direction that Dennis and Martha McMurray lived at that time. When I returned to the scene of the difficulty in a few minutes Stella McMurray, daughter of deceased, was there at or near the body of her father. I passed her just opposite my house as I went to the house. The wounds were on the left side of the head, one of which was near the top of the head but to the left side, and the

back part of the upper wound was the deepest, and the skin was cut or broken about two or three inches on the upper wound, and while we were washing the deceased that night I put my fingers in the back part of the upper wound up to the first joint. The other wound was just above the ear and was about parallel with the upper wound, or nearly so. The wound above the ear made a soft place, the skin was not broken. I noticed some eyebrows on a knot on the stick that Dennis hit W. C. McMurray with. The ax was about six or eight feet from where W. C. McMurray fell. Dennis McMurray and his mother, Martha McMurray, and the boy by the name of Cross had worked on this land in a small bottom near the creek putting up fence post that morning till about 11 o'clock and left and returned after dinner, and had been working there some little time before W. C. Mc-Murray came. I saw a man's coat and a sack lying on the west side of the branch near the branch. I did not see anyone place them there but it looked like W. C. McMurray's coat. After the difficulty was over, Dennis and Martha McMurray and the Cross boy went down the road towards where Mrs. McMurray and Dennis lived, and I did not see them any more that day. Martha McMurray *an old devil said* * * * we will kill you son of a bitch. I searched or assisted in searching W. C. McMurray after he was killed. We found a pocket book with $1.00 of money in it and a small piece of chewing tobacco in his pocket."

There was much other testimony for the Commonwealth incriminating the defendants, some of which is hereinafter referred to, but the residue of which need not be recited.

The rulings of the trial court on the admissibility of evidence were made the grounds of several exceptions, and are assigned as error.

[2, 3] Maggie Bright, a witness for the Common-wealth, was asked if she had heard the defendant, Martha McMurray, make any threats against W. C. McMurray, the deceased, and she answered, over the objection of the defendants: "On the day before the killing of W. C. McMurray, I went to the mail box with Martha, and she said they were going to fence that lot up there but she expected to have trouble. She never mentioned anyone's name. She said she was going to build the fence to keep her cow in."

The objection to this testimony was because the name of the deceased was not mentioned and there was no reference to him. It is said there was nothing to indicate what was meant by the expression, "looked for trouble."

Reliance is placed on *Mullins* v. *Commonwealth*, 113 Va. 787, 75 S. E. 193, to support the objection. In that case it is said: "A witness named Pucket was permitted to testify, over the prisoner's objection, that she was at the home of the accused some two months before the homicide, when the deceased came there to get a meal, and that about a half an hour after the deceased had left she heard part of a conversation between the accused and his wife, in which the latter said: 'He would be the hardest witness against you,' and the accused replied: 'Never mind, he would not be at court.'" No names were mentioned and the witness did not know to whom the accused and his wife were referring. It was a case of circumstantial evidence, and the Commonwealth was endeavoring to connect the prisoner with the offense by proving a motive on the part of the accused to commit it. The Commonwealth did not in any other way, directly or indirectly, connect the accused with the supposed threat, and the court said: "There being no evidence showing that the conversation be-

tween the accused and his wife was in reference to the deceased, the court ought to have sustained the accused's objection to it, in the absence of the assurance of counsel that other evidence would be duly presented during the progress of the trial which would show its admissibility; or, at least, ought to have admitted it only upon the condition that the Commonwealth would subsequently offer evidence showing that it was admissible."

It is true that a mere general threat, referring to no particular person, is not admissible in evidence, unless the accused be, in some way, connected with it, and the burden is on the Commonwealth to show the connection; but the connection "may sufficiently appear from the circumstances, or subsequent declarations of the accused, and if the circumstances are such that the language used might reasonably be construed to include or refer to the deceased or injured person, the evidence should be admitted and the question left to the jury." 6 Ency. Ev. 637.

In the instant case, the families of the deceased and of the accused were on unfriendly terms, title to the land was claimed by the deceased, and both parties claimed possession. On the day after the statement was made, according to the testimony for the Commonwealth, the accused attacked the deceased with an ax at the place where the accused "looked for trouble," and after he was mortally wounded she stated to one witness: "Yes, I guess we have killed him, but we had it to do," and she also made other similar statements to several witnesses. Under these circumstances, the trial court committed no error in permitting the statement of the witness to go to the jury.

[4] Another objection to the admissibility of testimony was allowing a witness to testify to a threat made

by Dennis McMurray, one of the accused, against the deceased. The ground of the objection was that the date of the threat was not given. While the witness was on the stand the accused could easily have asked the date, but did not do so. Even if this was error, it was harmless, as similar threats shortly before the homicide were proved by several other witnesses.

[5] The accused testified that they had been in possession of the land in controversy for twenty-seven or twenty-eight years, and had cultivated it and cut and sold wood from it. The Commonwealth, over the objection of the accused, was permitted to show by several witnesses, in rebuttal, that the land had not been in cultivation during that time. In this there was no error.

It is assigned as error that the following instruction was given at the instance of the Commonwealth, over the objection of the accused:

[6, 7] "The court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer without any provocation, or even with slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the prisoners the necessity of showing extenuating circumstances."

The ground of objection is that there was no evidence to support the instruction; that the ax in the hands of one of the accused was a mere agricultural instrument used in the work in which she was engaged, and that the stick in the hands of the other was picked up during the fight.

It is difficult to imagine the proof of a homicide, without any attending circumstances, but it was pointed out in *Sims* v. *Com'th*, 134 Va. 736, 115 S. E. 382, that it is the settled law of this State that every intentional homicide is presumed to be murder of the

second degree, and the burden of elevating it to murder of the first degree is on the Commonwealth, and of reducing it to manslaughter or excusable homicide is on the accused. If it be conceded that the instruments of death were not in the previous possession of the accused, within the meaning of the law, there still remains the unrebutted presumption arising from an intentional homicide, and also the evidence in the case of the circumstances of the killing. The verdict of the jury was for murder of the second degree, and the error, if any, in the instruction was harmless.

Furthermore, in *Mealy* v. *Commonwealth*, 135 Va. 585, 115 S. E. 528, it was said of an identical instruction:

"The objection urged to this instruction is twofold. It is said, in the first place, that the possession of the gun by the defendant was not such 'previous possession' as was legally requisite in order to make the instruction applicable. To sustain this contention we would have to overrule a long line of Virginia decisions, too numerous and familiar to require citation here.

[8] "The rule applied in this instruction has its foundation in the principle of criminal law that every person is presumed to have intended the natural and probable consequences of his voluntary acts. The test of the criminal intent in the use of a deadly weapon is to be found, not in the manner in which or the purpose for which the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose. For example, in *Honesty's Case*, 81 Va. 283, 295-6, the accused struck the fatal blow with a brickbat which he had but a moment before picked up, and in *Jones' Case*, 100 Va. 842, 855, 41 S. E. 951, the prisoner killed his victim with a post hole digger which he had in his hand before and at the time the altercation began,

and with which he was peacefully prosecuting the work of building a fence. In both of these cases it was contended, with respect to an instruction exactly like the one here complained of, that the 'previous possession' necessary to justify such an instruction must be understood as a possession originating in previous preparation for the crime; but in both cases this court rejected that contention."

[9] The accused tendered an instruction, which, so far as it need be recited, was as follows: "The court tells the jury that if the defendants, in good faith, believed they were at work on their own land, then they were where they had a perfect right to be, and that they did not have to leave there." The court refused to give the instruction as asked, and in lieu thereof gave the following: "The court tells the jury that if they shall believe from the evidence in this case that the defendants honestly believed at the time that they were working on land where they had the right to work, then, regardless of whether the deceased or the defendants were entitled to the possession of the premises, the deceased, W. C. McMurray, did not have the right to forcibly eject the defendants from the premises."

The object of both instructions was to tell the jury that the rights of the parties were not to be determined by the actual title or right of possession, and to present the doctrine of retreat. Neither instruction plainly told the jury what the doctrine of retreat was, and while the instruction tendered by the defendants correctly stated the law, the instruction given conformed more nearly to the facts of the case and embraced substantially the same proposition propounded by the defendants. The testimony was that the deceased ordered the defendants off the land, and was apparently

intending to enforce his order by forcibly ejecting them, and the instruction given responded to this evidence by telling the jury that if the defendants honestly believed "they were working on land where they had the right to work," then the deceased had no right to forcibly put them off, no matter which of them was entitled to the possession, or, to use their own language, "they did not have to leave there." The trial court committed no error in giving the substituted instruction. The doubt as to the correctness of the instruction would probably never have arisen if the defendants had, in the first instance, asked for an instruction plainly embodying the doctrine of retreat.

[10] The objection to the statement of counsel for the Commonwealth in his concluding argument before the jury, which is assigned as error, is not of sufficient importance to require discussion. It was the mere expression of an opinion as to why a witness at some distance from the affray "turned her back" during the altercation, and could not have affected the verdict.

[11] The refusal of the trial court to set aside the verdict on the ground of after discovered evidence is assigned as error. All of the evidence so offered was merely to impeach or contradict the chief witness for the Commonwealth. The law on this subject has recently been so fully considered and discussed in *Powell v. Comth.*, 133 Va. 741, 112 S. E. 657, 33 A. L. R. 541, as to render further discussion unnecessary. There was no error in the ruling of the trial court.

The wounds received by the deceased are described by the physician who made the *post mortem* examination as follows:

"I found two wounds on the left side of his head. One, or the upper wound, looked like it was or could

have been made with the back of an ax, and three and one-half to four inches long. This wound, I think, would have proved fatal. The other wound was along above the ear and about parallel with the upper wound. This wound was made with a blunt instrument, it didn't break the skin but broke through the skull. Either of these wounds would have proven fatal I think in a few minutes or a few hours. There was very little difference in the edge of the wounds at each end—practically parallel. The upper wound was about one inch from center or top of head. The other wound was parallel and was between the first wound and the ear. From the center of one to center of the other of the wounds was about two to two and one-half inches. The lower wound was just above the ear on the same side of the head and parallel with it, and the skull was crushed in from the side of the head, just as the other or upper one was. I saw no abrasion of the skin about the eyebrows."

[12] The testimony for the Commonwealth tended to show that the defendant, Martha McMurray, first struck the deceased with an ax and "he began to sink down and when he had gotten nearly to the ground Dennis struck him across the side of the head with a club." From this it is argued that the death of the deceased was accelerated by the last blow which was given by Dennis McMurray, and that the verdict should be set aside as to Martha McMurray. The law relating to the acceleration of the death of one who has received a mortal wound by an independent act of another need not be discussed, as it has no application to the facts of this case. The same witness who testifies that the last blow was given by Dennis McMurray, also testifies that it was a joint assault by the two defendants on the deceased. It is immaterial which struck the last mortal blow. They were both

guilty as principals.  1 Bish. New Crim. Law, sec. 618.

We find no error in the judgment of the trial court and it will be affirmed.

*Affirmed.*