Richmond

## WILLIAM RAY SMITH

### V.

## COMMONWEALTH OF VIRGINIA

January 11, 1980.

Record No. 790371.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

John A. Caldwell, Jr., for appellant.

Vera S. Warthen, Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

William Ray Smith was convicted by a jury of first degree murder and sentenced by the trial court to a term of twenty-five years in the

state penitentiary. The sole question on appeal is whether there was sufficient evidence of premeditation, an essential element of first degree murder.

About 7 p.m. on Sunday, August 28, 1977, Patricia Dale McGlothlin, age twenty, left home to go to an ice cream parlor in Richlands, Virginia, to obtain drinks for herself and her mother, Shirley McGlothlin. She was driving her mother's 1974 maroon Chevrolet Impala. When Patricia did not return by 8 p.m., Mrs. McGlothlin began making efforts to locate the girl. The following morning she reported to the police that her daughter was missing.

Carol Dye testified that she had never met the defendant Smith until August 28, 1977, when he asked her husband to take him to a local trailer court. Mrs. Dye said that when they got to the court it developed that Smith wanted to "pick up two garbage bags of dope" and offered her husband $150 to deliver it. She objected and told her husband to return Smith to the King Kone and then take her home. Mrs. Dye also testified that Smith was "real nervous. . . and got real upset," and that during the trip back to the King Kone the defendant said, "I've got it in for someone." She said that when she asked "Who?", he would not respond. The defendant got out of the Dye car at the King Kone.

Stevie A. Honaker, defendant's brother-in-law, testified that he was at the King Kone and saw Patricia McGlothlin drive up in her mother's car, which he described as a maroon Chevrolet Impala. He said a few minutes later "this Dye boy" pulled up and Smith got out of the Dye car and got in the McGlothlin car. Honaker then observed Smith and Patricia drive away.

Patricia was not seen again by anyone who testified until Wednesday, August 31st. Harold Boyd said that he saw Patricia and Smith the latter part of August 1977, on what he thought was a Wednesday, when he passed them near a cemetery on Red Root Ridge. He said that they were parked in a Chevrolet Impala and that Patricia was on the passenger side of the car. Tommy D. Shelton testified that he also saw Patricia and Smith on a Wednesday in August in a maroon Chevrolet near the cemetery. Grant Van Dyke testified that he saw Patricia and Smith parked on Red Root Ridge Road in a maroon Chevrolet on the last Wednesday in August (August 31, 1977), about 10 or 10:30 at night. He said Patricia was "sitting with her head reared back" and that neither she nor Smith ever moved.

Mary Smith lived on Red Root Ridge in her parents' house located on a road near the cemetery which figured prominently in the evidence. She testified that on Wednesday night, August 31, 1977, about 11

p.m., she observed the rear lights of a car going down the ridge. She said the trail the car was following was sparsely traveled, and no one lived in the area. She testified that the following morning, Thursday, September 1st, about 10:30 or 11 a.m., Smith came to their house alone, driving a "red car with a black vinyl top," and asked for a drink of water. She also said that Smith returned on three different occasions, each time sitting in the car and blowing the horn. She testified that until this period in late August, Smith had visited her home only twice in an eight-month period.

Mrs. McGlothlin's car was recovered in defendant's possession on Monday, September 5, 1977. Smith, in an attempt to resist arrest, held his four-year-old son hostage for approximately twenty-four hours. He stated to the officers that he did not intend to go back to jail and also that he purchased the Chevrolet automobile from Patricia. Smith exhibited to the police a handwritten note that he said was given him by the girl. It reads: "I Patricia McGlothlin give this 1974 Chevy Impala to William Smith." Signed, "Patricia McGlothlin" At the bottom of the writing, in hand print, is an addition, "For $200.00" A handwriting expert testified that the handwriting was that of Patricia, but he could not identify the hand-printed portion as that of the girl.

On September 27, 1977, the badly decomposed and partially skeletonized body of Patricia McGlothlin was found on a forty-five degree embankment in a heavily wooded area on Red Root Ridge, about sixty or seventy feet down from a logging road. This is a remote section of Tazewell County, locally referred to as Doran Mountain. Located in this mountainous area are the cemetery, the house in which Mary Smith and her parents lived, and the roads on which Smith and Patricia were seen by witnesses.

Dr. David W. Oxley, Deputy Chief Medical Examiner, testified that he was of opinion that Patricia's death occurred "within a day or two" of the time the victim was reported as missing. He attributed her death to a large, depressed skull fracture caused by a blunt force applied to the right back of the head.

On November 23, 1977, Smith voluntarily, and in the presence of his attorney, gave a statement in which he denied the murder of Patricia. In the statement he said: "I have known Patricia McGlothlin for about four years. I have never dated her, but I have rode [sic] around some with her and smoked pot and I have been to a few parties at different places when she was there." He stated that Patricia told him she wanted to sell the car because "she needed the money for reefers for someone else"; that he paid Patricia $200; that he then accompanied her to Sword's Creek, where she bought marijuana from

an unidentified person; and that after smoking marijuana he let her use the car that night to go to Grundy. In his statement Smith further claimed that he saw Patricia the next morning (Monday) but did not see her again until the following Friday, at which time he loaned his automobile to one Joe Morris, who took Patricia with him. He stated that this was the last time he ever saw her. The balance of Smith's statement was devoted to an effort by him to implicate Joe Morris in the murder of Patricia and to absolve himself of blame. Morris testified that he had never seen or known Patricia McGlothlin and denied any involvement in the murder.

Stuart Cole, a cellmate of Smith's in the Tazewell County Jail, testified that he discussed the murder charge with Smith and that defendant had said "he thought he had killed a girl, but he couldn't remember." Cole admitted that he voluntarily told the officers of his conversation with the defendant and that at the time he first talked to the police officers he told them that William Smith said "he had been with Patricia and that he had killed the girl."

Franklin Sams, Special Agent for the United States Secret Service, was in Tazewell County during 1977 and 1978, on an official investigation which involved both Patricia McGlothlin and the defendant, although apparently neither knew of this investigation. Sams testified that he "developed Smith as a suspect in a government matter that was under investigation," and that on April 6, 1978, he interviewed Smith in the presence of his attorney. He told Smith that both he and Patricia McGlothin were suspects in the "inquiry" he was conducting. When asked if Smith made any statement or comment to him, Sams responded: "Yes. While I was explaining to him the reason for the interview, he made a brief comment and that comment was 'If I make any admissions on this, then I give them a motive for her murder.' "

■ The fact of the homicide is not in issue here. What is in issue is the sufficiency of the evidence to show premeditation. To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time. As we said in *Pannill* v. *Commonwealth*, 185 Va. 244, 255, 38 S.E.2d 457, 463 (1946), quoting from *McDaniel* v. *Commonwealth*, 77 Va. 281, 284 (1883), "it is necessary that the killing should have been done on purpose and not by accident or without design. . . ." The exact state of the defendant's mind at the time of killing is the crucial factor in determining intent. "It is the will and purpose to kill, not necessarily the interval of time, which determine

the grade of the offense." *Akers* v. *Commonwealth*, 216 Va. 40, 48, 216 S.E. 2d 28, 33 (1975).

■ There is evidence from which the jury could have found that Patricia McGlothlin was brutally murdered by an intentional blow to the back of her head, delivered with such force and intensity as to depress the skull of the victim, and that her body was dragged or thrown down the side of a steep incline in a remote mountainous area where it would not likely be found. Whether this homicide is murder in the first or second degree is a question of fact. *Williamson* v. *Commonwealth*, 180 Va. 277, 281, 23 S.E.2d 240, 241 (1942). And whether the defendant willed, deliberated, and premeditated to kill Patricia McGlothlin is a question for the jury to determine from all the facts and circumstances. *Hairston* v. *Commonwealth*, 217 Va. 429, 432, 230 S.E.2d 626, 628 (1976).

The victim left her home on Sunday evening, August 28, 1977, never to return or to be seen again by her family. A short time afterwards the defendant Smith was seen entering her car. There is no testimony that she was ever again seen alive out of the defendant's presence. Smith did not testify, and neither he nor the Commonwealth introduced any evidence from which the jury might have concluded that she was the victim of an accident or of a killing by anyone other than the defendant. The nature of the injury which caused her death is a fact and circumstance to be considered by the jury. The blow that depressed her skull was not the type that would generally result from an accidental fall, a fight, or a slap. It was the type of injury that would be caused by a blunt instrument delivered with great force and accuracy.

There is no evidence that Patricia had any reason for not returning to her home with the drinks that she had been dispatched to obtain. In determining whether she may have been deliberately detained by defendant after he entered her car, the jury could well have considered the fact that when threatened with arrest by the officers, the defendant did not hesitate to hold as a hostage and threaten to injure his own son in order to frustrate that arrest. It is obvious from the testimony that some relationship existed between Smith and Patricia. While the jury disregarded Smith's statement to the officers which sought to place the blame for the killing of Patricia on Joe Morris, the jury could have believed Smith's statement that he and Patricia had been together on numerous occasions and that they had used drugs together. Likewise, Smith's possession of Mrs. McGlothlin's car, the cryptic note which allegedly transferred the car's ownership, the addition on the bottom thereof relating to the alleged purchase price, and

the conflicting statements made by Smith* may not have been satisfactorily explained to the jury.

In determining the relationship between the accused and the victim, the jury was required to consider all relevant facts and circumstances. It was testified that immediately prior to the time Smith left the Dyes and entered the automobile driven by Patricia McGlothlin, he was nervous and upset. His mental condition was such that he volunteered the statement to the Dyes that "I've got it in for someone." Admittedly, this was a mere general threat and referred to no particular person. Therefore, the burden was on the Commonwealth to show the connection between the threat and the victim. However, as we said in *McMurray* v. *Commonwealth*, 143 Va. 489, 497, 129 S.E. 252, 255 (1925), quoting from 6 Ency. Ev. 637:

> [B]ut the connection "may sufficiently appear from the circumstances, or subsequent declarations of the accused, and if the circumstances are such that the language used might reasonably be construed to include or refer to the deceased or injured person, the evidence should be admitted and the question left to the jury."

The jury heard and evaluated the testimony of Stuart Cole and his statement that defendant had admitted to him that he killed or thought he killed Patricia. The jury had a right to consider all the actions and conduct of the defendant before, at the time of, and after the murder. There is nothing in the evidence to point to anything other than a deliberate, intentional, and premeditated killing. There is no evidence of any remorse on the part of Smith. His every action following the homicide has been calculated to avoid the consequences of his act and to shift the responsibility to another. His actions have been wholly inconsistent with a homicide committed accidentally, or unintentionally.

While motive is not an essential element of the crime of murder, "[m]otive is usually an element relevant to establish intent when a conviction is based primarily on circumstantial evidence." *Ward* v. *Commonwealth*, 205 Va. 564, 570, 138 S.E.2d 293, 297 (1964). If we accept the uncontradicted testimony of the Secret Service Agent as to

---

* Smith originally told the arresting officer that he bought the car for $300. In a signed statement dated September 5, 1977, Smith gave an account of when he last saw Patricia which was wholly inconsistent with his November 23rd statement. Among other things, Smith stated that he last saw Patricia on a Richmond street with a person he did not know.

Smith's own statement, Smith harbored a motive for Patricia's murder. Motive is defined in *Black's Law Dictionary* 914 (5th ed. 1979) as: "Cause or reason that moves the will and induces action. An inducement, or that which leads or tempts the mind to indulge a criminal act." Smith's admission that a motive existed was a circumstance which the jury had a right to consider in determining if the bludgeoning of Patricia was a willful, deliberate, and premeditated act, one prompted by a cause or reason or by an inducement which moved the will and induced the action by the defendant. Motive, in the peculiar context of this case, does assume importance because it suggests reasoned, intended, or purposeful action.

The trial of the defendant was conducted before a jury and consumed three days. Twenty-three witnesses testified. The instructions were comprehensive and clearly defined the various grades of homicide, the responsibility of the jury, and the burden which rested on the Commonwealth to establish not only the guilt of the defendant beyond a reasonable doubt, but the specific crime of which he was guilty. The jury found that the homicide was committed by Smith intentionally, deliberately, and with premeditation. Its verdict has the approval of the trial judge. We cannot say that the jury's verdict is plainly wrong or that the evidence is insufficient, as a matter of law, to support a conviction of first degree murder. Accordingly, the judgment of the lower court is

*Affirmed.*

POFF, J., dissenting.

To affirm defendant's conviction of first degree murder, we must be able to conclude, and I cannot, that the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove the element of premeditation beyond a reasonable doubt. *See Jackson* v. *Virginia*, 443 U.S. 307 (1979). At most, the evidence shows that a criminal homicide was committed, that defendant was the criminal agent, and that he acted with malice. But where is the evidence that he premeditated the act?

The majority say that "to premeditate means to adopt a specific intent to kill" and that such intent "need not exist for any particular length of time." Such a definition equates premeditation with adoption of intent. But the two concepts are not synonymous. Each is a distinct element of first degree murder, and the adoption of intent is not necessarily the product of premeditation. *Baker* v. *Commonwealth*, 218 Va. 193, 195, 237 S.E.2d 88, 89 (1977).

Carried to fruition, an intent to kill, though adopted contemporaneously with the act of killing, is criminally culpable. Meditation preceding and resulting in the adoption and execution of intent to commit a lethal act raises the level of culpability. This is so because such a process of contemplation, reflection, and optional decision evinces willful persistence in a continuing criminal design as distinguished from a sudden onset of a criminal impulse. Manifestly, this difference in levels of culpability is the reason underlying the legislature's distinction between murder of the first and second degrees. And it is clear that this Court recognizes the distinction between premeditation and adoption of an intent to kill, for voluntary intoxication may negate the former but not the latter. *Griggs* v. *Commonwealth,* 220 Va. 46, 255 S.E.2d 475, 479 (1979); *Chittum* v. *Commonwealth,* 211 Va. 12, 18, 174 S.E.2d 779, 783 (1970).

In my view, the majority's conclusion that the homicide in this case was murder of the first degree rests upon inferences drawn from random facts which, considered separately and collectively, are insufficient to support a finding of premeditation beyond a reasonable doubt. I would reverse the judgment and remand the case with instructions that defendant be tried for no offense greater than second degree murder. *See Greene* v. *Massey,* 437 U.S. 19, 25 n. 7 (1978); *Burks* v. *United States,* 437 U.S. 1 (1978).

COMPTON, J., dissents.