COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Fitzpatrick, Judges Benton and Clements
Argued at Alexandria, Virginia


ALLAN LEIGH ROTHER

v.      Record No. 2187-02-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JAMES W. BENTON, JR.
DECEMBER 30, 2003

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
William D. Hamblen, Judge

Robert F. Horan, III (Hart & Horan, on brief), for appellant.

Jennifer R. Franklin, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


A jury convicted Allan Leigh Rother of first-degree murder and sentenced him to life in

prison.  On appeal, Rother contends that the trial judge erred in (1) refusing to suppress statements

he made to the police, (2) finding the evidence sufficient to establish murder and premeditation and,

thus, denying his motion to strike the evidence, and (3) overruling objections to the prosecutor's

closing statements.  We affirm the conviction.

I.

Rosemary Tascione and Rother were in a relationship for sixteen years and lived together in

Prince William County.  Tascione's employment supervisor testified that she left a telephone

message at Tascione's residence on Friday, November 3, 2000, asking her to come to work early on

Monday.  Tascione never returned her call.  On Monday, Rother telephoned one of Tascione's

co-workers and Tascione's supervisor.  He said he had not seen Tascione and expressed concern for

her.  Rother went to his neighbor's house that same evening and told her that he was worried

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

because Tascione was missing. The neighbor described Rother's appearance as "pale as a ghost," "shaking," and "nervous," and recalled that Rother said several times "death comes in multiples of three."

On Tuesday, Rother arrived at work forty minutes later than his usual time of arrival. He told a co-worker that Tascione was missing and showed him a paper with names of people he intended to contact in an effort to locate Tascione. That evening, Officer Granell went to Rother's residence in response to a report from Rother about Tascione's disappearance. Rother told him he last saw Tascione in bed when he left for work Monday morning. Rother said none of her clothing was missing, she did not have a car, and she would never leave home without telling him. Rother also told Officer Granell that Tascione was under a doctor's care for depression and that both he and Tascione were alcoholics. After interviewing Rother, Officer Granell entered Tascione's name into a law enforcement computer database to alert other law enforcement officials about Tascione's disappearance. He later learned that Tascione's body had been found in the District of Columbia before he spoke with Rother.

At 3:00 a.m. on the morning of Tuesday, November 7, 2000, the same day Rother reported Tascione missing, the District of Columbia police discovered her body in the alley behind her office. Tascione's arms were bound behind her back with duct tape and her breasts had been cut from her body. A plastic bag covered the front of her torso.

The grand jury indicted Rother for first-degree murder of Tascione in violation of Code § 18.2-32.

## II.

On appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). At the hearing

on Rother's motion to suppress evidence, Detective Paul Masterson testified that three days after the police found Tascione's body he and two other detectives went to Rother's workplace and asked Rother if he would come to the police station to assist in the investigation. He did not tell Rother the police had found Tascione's body. Rother agreed to go to the station and drove his own car. Rother smoked a cigarette outside the police station, chatted with Detective Masterson, and then followed the detectives inside the building to an interview room.

Detective Masterson testified that he prepared a report of the discussion he had with Rother and that a videotape, which was of poor quality, indicated other statements were made. Detective Masterson testified he took four or five breaks during their talk, leaving Rother alone in the room with the door closed while he spoke to detectives from the District of Columbia. Although Detective Masterson did not tell Rother he was free to leave, Rother was not restrained and the door to the interview room was not locked.

In his testimony about the interview, Detective Masterson said Rother talked extensively about Tascione. Rother said he thought Tascione may have done something to herself because she used antidepressants, had once before left a suicide note, and had "talked . . . about throwing herself in front of a train." Rother said Tascione's "finances were in pretty bad shape" and "she owed quite a bit of money back to the IRS." Rother also said he and Tascione argued about finances the day before she disappeared.

Detective Masterson asked Rother if he had been in "serious trouble in the past." Rother said he had, but could not remember what it involved. As they talked, Detective Masterson learned that Rother had a knife and requested to see it. After he examined the knife, Detective Masterson returned it to Rother and left the room. When Detective Masterson returned and resumed the questioning, Rother smoked a cigarette, "appeared to be upset," and said he had left

money in his car.  Detective Masterson told Rother that he would have a detective lock his car. Rother repeatedly said "something must be wrong" and exhibited discomfort.

An hour after the discussion first began, Detective Masterson told Rother the police had found the body of a woman in the District of Columbia.  When Rother asked, "is she dead," the detective said he believed she was.  He told Rother that the police from the District of Columbia were coming to talk to him and falsely said the police had evidence that Rother had been in the District of Columbia when the body was put in the alley.  When the detective mentioned Rother's argument with Tascione on Sunday, Rother said he would not hurt her.  The detective testified he wanted "to press [Rother] a little bit harder to see if he did have any involvement in her disappearance."  As he began to do so, Rother asked, "Can I call a lawyer?"  Detective Masterson testified he told Rother he could have a lawyer if he wanted one and continued questioning Rother.  The detective told Rother he needed "to do the right thing" and said he had proof Rother was in the area of the alley.

Although not reflected in his notes, Detective Masterson testified that he repeatedly told Rother "to do the right thing by [Tascione]" and that he told Rother, "Not only did you hurt her, but you hurt her bad."  He said to Rother that something bad had happened to Tascione and that he needed Rother "to tell . . . what happened."  Although not reflected in his notes of the discussion, Detective Masterson also testified that he told Rother three or four times that Tascione's nagging may have been the reason Rother hurt her, that Rother "need[ed] to tell [him] how it happened," that he "want[ed] to make it look like [Rother was] forthcoming," and that Rother would look like a "monster" if he did not tell what happened.  Detective Masterson also acknowledged that, although not contained in his notes, he had said Rother was the kind of person that thought of this every night.

In response to these comments, Rother told Detective Masterson that he found Tascione dead in his bed when he came home from work Monday evening. Rother said he was scared when he found her and did not know what to do. He told the detective that he put Tascione in his car and drove into the District of Columbia. Rother said Tascione was not cut or bleeding when he pulled her body from the vehicle in the alley.

Detective Masterson left the room again. When he returned, he retrieved the knife from Rother and read Rother Miranda rights. While Detective Masterson was reading the Miranda rights, Rother said he wanted a lawyer. Detective Masterson testified that he then stopped questioning Rother and left the room briefly. When Detective Masterson returned, he sat across from Rother. He testified that Rother began saying, without any questions from him, "maybe I'm a monster," "I'm a drunk," "I'm a rotten person," and "I'm going to jail for twenty years." Detective Masterson then brought into the room Detective Garvey, a District of Columbia officer. Detective Masterson said that Detective Garvey told Rother that he could not talk to Rother because he was aware Rother had received Miranda warnings, but he wanted to let Rother know that he was available if Rother wanted to talk. Detective Masterson testified that, as Detective Garvey began to leave, Rother said he would talk without an attorney present.

The prosecutor stipulated at the suppression hearing that statements Rother made after Detective Garvey entered the room and began questioning Rother were inadmissible. The trial judge ruled that those statements were inadmissible. They were not used at trial and are not at issue on appeal. The trial judge ruled, however, that Rother was not in custody until Detective Masterson read to him Miranda warnings. He also ruled that statements Rother made after Detective Masterson read the Miranda warnings, and before Detective Garvey entered the room, were spontaneous and therefore admissible.

Rother concedes that he voluntarily went to the police station and that initially he was not in custody. He contends, however, that as the interview progressed the circumstances of the interview became custodial and, therefore, the detective should have read Miranda warnings to him earlier in the interview. The Commonwealth argues that Rother was not in custody until the detective read to him Miranda warnings.

In Oregon v. Mathiason, 429 U.S. 492 (1977), the Supreme Court described the circumstances under which the administering of Miranda warnings applies:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

Id. at 495.

The trial judge considered the detective's testimony and viewed the video tape of the interview. He found that Rother drove himself to the police station, that only one police officer was present during questioning, that the interview room was not locked, that Rother was not restrained when the detective left the room, and that the interview lasted no more than an hour and forty-five minutes. The trial judge also found as follows:

> [O]ut of all the things and all of the factors that the Court needs to weigh and consider as to whether or not he was in custody during the interrogation the thing that was singly most impressive to the Court was the fact that . . . Rother, upon questioning admitted that he had a knife and actually gave the knife to the detective. The detective looked at the knife and gave it back to . . . Rother.

- 6 -

It seems to me that that was the most striking suggestion that this was not a custodial interrogation because the very first thing at any type of arrest that an officer does is secure the situation for his personal safety of the person who is subject to the arrest. So by returning a weapon to . . . Rother it was at least a good suggestion that this person wasn't under any tradition arrest.

The record supports these factual findings and the judge's conclusion that Rother was not in custody until the <u>Miranda</u> warnings were read to him. Indeed, in view of the totality of the circumstances the judge reasonably could conclude that Rother "voluntarily accompanied [Detective Masterson] to the police station in an effort to continue the ruse" about Tascione's unexplained disappearance. <u>Bailey v. Commonwealth</u>, 259 Va. 723, 746, 529 S.E.2d 570, 583 (2000).

The record does not support Rother's claim that as the interview progressed a reasonable person would believe he was in custody.

Among the circumstances to be considered when making the determination of whether a suspect was "in custody" are (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

<u>Harris v. Commonwealth</u>, 27 Va. App. 554, 565-66, 500 S.E.2d 257, 262 (1998).

Rother asserts that the "small and windowless interrogation room," magnified the coercion. The Supreme Court has previously held, however, "it is the custodial nature rather than the location of the interrogation that triggers the necessity for giving <u>Miranda</u> warnings." <u>Coleman v. Commonwealth</u>, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983). Although Rother argues that Detective Masterson failed to allow him to leave the room to smoke a cigarette and to lock his car, the record establishes that the police did not restrain him in any way. Rother was not handcuffed, and the interview room was not locked. The detective did not tell him he could

not leave and did not otherwise prevent Rother from leaving the interview room. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (holding that "the ultimate inquiry is simply 'whether there is a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"). Indeed, during each of the four or five occasions Detective Masterson left the interview room, Rother was alone in the room and he remained in the unlocked room unrestrained.

Although Detective Masterson misled Rother into believing he had evidence that placed Rother in the alley where Tascione's body was found, "[t]he officer's false statement . . . has nothing to do with whether [Rother] was in custody for purposes of the Miranda *rule*." Mathiason, 429 U.S. at 495-96. Because Rother was not under arrest or in custody, his inquiry "Can I have a lawyer?" did not affect the judge's conclusion. Evidence in the record also supports the trial judge's ruling that Rother made spontaneous statements that were not the product of interrogation. Without being prompted by any questioning, Rother said "I am going to jail for twenty years," "I was so scared, I didn't know what to do," and "Maybe I am a monster, I'm a drunk." Although Rother requested an attorney before making these outbursts, "spontaneous admission[s] not induced or initiated by the police" are not in these circumstances inadmissible. Bradshaw v. Commonwealth, 228 Va. 484, 490, 323 S.E.2d 567, 570 (1984).

We, therefore, affirm the trial judge's ruling that Rother was not in custody prior to the Miranda warnings and that Rother's spontaneous statements after the detective read those warnings were not the product of custodial interrogation. Accordingly, the trial judge did not err in refusing to suppress these statements.

III.

Rother contends the evidence was insufficient to prove beyond a reasonable doubt that he murdered Tascione. Alternatively, Rother contends that even if the evidence proved he

- 8 -

committed the killing, the evidence does not support a finding of premeditation. We hold that the trial judge did not err in denying Rother's motion to strike and that the evidence supports the jury's verdict.

"Every malicious homicide is murder." Barrett v. Commonwealth, 231 Va. 102, 105, 341 S.E.2d 190, 192 (1986). "Murder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree . . . . All murder other than capital murder and murder in the first degree is murder of the second degree." Code § 18.2-32.

> To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time. . . . "[I]t is necessary that the killing should have been done on purpose and not by accident or without design . . . ." The exact state of the defendant's mind at the time of the killing is the crucial factor in determining intent. "It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of offense."

Smith v. Commonwealth, 220 Va. 696, 700-01, 261 S.E.2d 550, 553 (1980) (citations omitted).

Richard Griffin, an evidence technician, described the condition in which Tascione's body was "lying posed in the alley" with her legs splayed. Her arms were bound behind her back with duct tape, and her torso was covered with a plastic bag. Tascione's breasts had been removed and were not found. Griffin testified that the absence of sprayed blood in the alley indicated that Tascione was killed somewhere else and that the body was dumped in the alley. Based on his examination of debris found on the body and a straight line of "kitty litter or sand debris," Griffin concluded that her body had been dragged off a truck or vehicle with a tailgate.

Following Rother's arrest, the police searched Rother's trailer and his station wagon and seized various items, including several rolls of duct tape and several dark color plastic bags. Jennifer Gombos, a forensic examiner, determined that blood stains found on the floor inside Rother's trailer and vehicle matched the blood sample taken from Tascione. She identified a

"whitish crystalline powder" that was found in the rear corner of Rother's vehicle as a substance "similar to clay or kitty litter." Gombos also "observed a very large red brown heavy spatter like pattern" on a bucket found in the vehicle. Gombos determined that the stain matched Tascione's DNA and the "color and consistency" indicated that it was blood. Gombos testified that there was no test that she could perform to determine how old the blood stains were.

Although Rother did not say he killed Tascione, Rother did tell Detective Masterson that he put her body in an alley in the District of Columbia. The medical examiner, Wendy Gunther, could not give an accurate time of death, but she opined that "the body had not been dead for a day because it would have been all cold" and testified that Tascione had been dead "for a little while." According to the autopsy, Tascione had "two big fresh bruises on the forehead." The condition of Tascione's lower lip revealed that her mouth was probably struck from the outside. Gunther opined that the unusually pale color of Tascione's mouth when the rest of her face was purple "suggest[ed] . . . that there was something pressing against her mouth" while she was dying. The injuries to Tascione's neck indicated "there may have been a gripping of the neck with the thumb and fingers pinching together in the back." Nine of Tascione's ribs were broken prior to death. Based on the dislocation of Tascione's shoulders and her broken back, Gunther opined that Tascione's "arms were pulled backward and perhaps some pressure applied across the mouth until the arms partly dislocated and the neck broke and the lower back broke." Gunther testified that the combination of these injuries prevented Tascione from getting oxygen to the heart and so she died "fairly shortly after all those injuries were inflicted." Gunther also testified that the neck and back broke at the same time and so may have the ribs. Gunther concluded that the cause of death was "blunt trauma to the head, neck and chest" causing Tascione to asphyxiate. Gunther found "traces of dirt and white powder on the body" and "a crystalline substance" in her lungs that was probably introduced into her system after she died.

Gunther also concluded that Tascione's breasts were removed post-mortem using a knife by someone that was "fairly expert using a sharp blade."

The evidence was sufficient for the jury to find that Rother dumped Tascione's body in an alley in the District of Columbia and attempted to conceal his actions by filing a missing person's report with the police and telling friends and neighbors that he was looking for Tascione. When Officer Granell responded to Rother's missing person's report, Rother told him that he last saw Tascione Monday morning and that she was undergoing treatment for depression. Later, Rother told Detective Masterson that Tascione was suffering from financial problems and previously talked about committing suicide. Although Rother told his co-worker he was late for work because he voted, the county's assistant registrar of voters testified that her records showed Rother did not vote that Tuesday. The evidence also proved that when Rother's former neighbor told him the police had dug in his yard looking for Tascione's breasts, Rother said, "I don't care if they dig up the whole trailer park or all of D.C., they're not going to find them." The night before Tascione's body was discovered, Rother also remarked to another neighbor that "death comes in multiples of three." From the totality of this evidence, the jury could find beyond a reasonable doubt that Rother maliciously killed Tascione.

Rother further contends the evidence does not support a finding that the murder was premeditated. Rother argues the absence of premeditation is demonstrable because the evidence does not establish that a murder weapon was used in the killing and the medical examiner's testimony establishes that the fatal injuries to Tascione could have resulted from a single act. We disagree.

The Supreme Court has previously upheld convictions for first-degree murder where the issue was premeditation and no evidence proved a weapon was used in the killing. See Clozza v. Commonwealth, 228 Va. 124, 131, 321 S.E.2d 273, 277 (1984) (where a 13-year-old girl died

- 11 -

after several beatings about her head and face causing her to hemorrhage and aspirate blood); Smith, 220 Va. at 699, 261 S.E.2d at 552 (where a woman died from a "large depressed skull fracture caused by blunt force applied to the . . . head"). The evidence in this case proved that Tascione died after having her neck, back and ribs broken. Although the evidence did not prove Rother used a weapon to kill Tascione, the evidence clearly indicates that Tascione died after severe physical trauma was applied to her body. The absence of evidence that a weapon was used in the killing does not negate the jury's finding that Rother intended to kill Tascione.

To further support his argument that the evidence is insufficient to prove premeditation, Rother cites the Supreme Court's holding in Rhodes v. Commonwealth, 238 Va. 480, 384 S.E.2d 95 (1989), that the defendant, who inflicted the injuries that caused her infant child to die, did not have the requisite intent to warrant a first-degree murder conviction. As in the present case, the evidence of intent in Rhodes was based primarily on circumstantial evidence. Noting that "premeditation and formation of an intent to kill seldom can be proved by direct evidence" the Supreme Court ruled that a "combination of circumstantial evidence may be sufficient." Id. at 486, 384 S.E.2d at 98. Indeed, the Court has held that the type of evidence a jury may consider in deciding whether to elevate a homicide to first-degree murder includes the following:

> [T]he jury may properly consider the brutality of the attack, and whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection. While motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent.

Epperly v. Commonwealth, 224 Va. 214, 232, 294 S.E.2d 882, 892-93 (1982).

The evidence permitted the jury to find that Rother struck Tascione about the head and mouth, forcefully broke her neck, broke nine of Tascione's ribs, and pulled her arms until he dislocated her shoulders and broke her back. Although Tascione's fatal injuries may have

- 12 -

occurred simultaneously, the number of injuries suggests that her death was not the result of one quick, sudden act, but rather the result of "some prolonged physical effort by [Rother, which] coupled with the . . . facts which identified [Rother] as the criminal agent, were relevant to the determination whether [Rother] acted . . . with premeditation." Beck v. Commonwealth, 2 Va. App. 170, 177, 342 S.E.2d 642, 646 (1986). The evidence also proved Rother made elaborate efforts to conceal his involvement in her murder. Although there is no evidence in the record about motive, all of Rother's "actions have been wholly inconsistent with a homicide committed accidentally, or unintentionally," Smith, 220 Va. at 702, 261 S.E.2d at 554, and consistent with a homicide committed willfully, deliberately and with premeditation. The principle is well established that premeditation need only exist a moment before the fatal act is committed. Epperly, 224 Va. at 231, 294 S.E.2d at 892.

In summary, the evidence was sufficient to prove that Rother killed Tascione by breaking her neck, back, and ribs and causing injury to her head; that Rother performed acts of mutilation to Tascione's body after she died; and that he transported Tascione's body to an alley and tried to mislead the police, friends and neighbors about her whereabouts. The combination of all of the evidence supports the jury's finding that Rother maliciously killed Tascione willfully, deliberately, and with premeditation.

IV.

Lastly, Rother contends that the prosecutor made improper statements during his closing argument to the jury regarding the reasonable doubt standard. Although Rother's attorney objected to the remarks, he failed to request a cautionary instruction or a mistrial after the trial judge did not sustain the objection. "Unless a defendant has made a timely motion for a cautionary instruction or for a mistrial, we will not consider his assignments of error alleging that improper remarks were made by the prosecutor." Schmitt v. Commonwealth, 262 Va. 127, 148,

547 S.E.2d 186, 200 (2001). Thus, we hold that Rother failed to preserve for appeal his objection to the prosecutor's closing statements.

V.

For these reasons, we affirm the trial judge's refusal to suppress Rother's statements to the police, and we affirm the conviction for first-degree murder.

<u>Affirmed</u>.