## Richmond

### WILLIE LLOYD TURNER

### v.

### COMMONWEALTH OF VIRGINIA

November 26, 1980.

Record No. 800375.

Present: All the Justices.

516

John C. Lowe (J. Lloyd Snook, III; Thomas L. Woodward, Jr.; William R. Savage, III; Lowe and Gordon, Ltd., on briefs), for appellant.

Robert H. Anderson, III, Assistant Attorney General (Marshall Coleman, Attorney General, on brief) for appellee.

I'ANSON, C.J., delivered the opinion of the Court.

The defendant, Willie Lloyd Turner, was convicted of capital murder, Code § 18.2-31(d)[1]; possession of a sawed-off shotgun in the commission of a crime of violence (robbery), Code § 18.2-300(A); and the use of a firearm (a pistol) in the commission of a felony (murder), Code § 18.2-53.1. The jury fixed Turner's punishment at one year in the penitentiary for violating Code § 18.2-53.1 and life imprisonment for violating Code § 18.2-300(A). In the second stage of the bifurcated proceeding conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury fixed the defendant's punishment for capital murder at death. At the conclusion of a separate sentencing hearing conducted pursuant to Code § 19.2-264.5, the trial court sentenced the defendant to death for capital murder and sentenced him in accordance with the jury's verdicts on the other two offenses. The defendant is here for an automatic review of the death sentence, consolidated with his appeal from his several convictions. Code § 17-110.1.

---

[1] Code § 18.2-31(d) provides that "[t]he willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon" constitutes capital murder.

## I.  FACTS

On July 12, 1978, at approximately 11:30 a.m., Willie Lloyd Turner, a black male, entered a jewelry store owned and operated by W. Jack Smith, Jr., a white male. In addition to Smith, an employee (Mary Huffman) and a customer were present when Turner entered the store. After entering the store, Turner displayed a sawed-off shotgun previously concealed by a towel and demanded money and jewelry. Smith, while placing money and jewelry into the store's jewelry bags, triggered a silent alarm alerting the police department.

Judith R. Cosby and Police Officer Alan D. Bain, having entered the store without knowing a robbery was in progress, were detained in the store by Turner. Having discovered Smith had triggered a silent alarm, Turner demanded that Smith turn off the alarm. After acceding to Turner's demand, Smith, along with Cosby, began placing additional valuables designated by Turner into jewelry bags.

Near the rear of the store, Turner examined a revolver taken from Bain and fired a bullet toward the rear wall. Turner stated if he saw or heard any additional police officers, he was going to start killing those in the store. About that time, Bain heard a siren. Turner then walked from the back of the store toward the middle of the store, where Smith was stationed behind a counter, and fired a bullet from the revolver at Smith without warning. Smith, with blood on his temple, slumped behind the counter. Bain began talking with Turner, promising him to take him anywhere he wanted to go and asking him not to shoot again. While Bain talked with Turner, two occupants scrambled out the front door. After Turner told Bain he was going to kill Smith because he had triggered the silent alarm, Turner leaned over the counter and fired two bullets from the revolver into Smith's chest in rapid succession. Bain then grabbed and subdued Turner while Cosby ran out the front door. Smith died as a result of the bullets fired by Turner into Smith's chest.

## II.  JURY SELECTION AND SEQUESTRATION

Several of the defendant's assignments of error concern the manner in which voir dire was conducted. Over defense counsel's objections, the trial judge ruled that he alone would ask the questions of prospective jurors during voir dire. He also concluded that he would question jurors in groups of five, except when questioning jurors concerning their views on the death penalty. Although questioning concerning the death penalty occurred at least initially in groups of

five, each prospective juror was required to answer individually at least two questions concerning capital punishment.[2] Prior to the day of trial, the court asked counsel for the Commonwealth and the defendant to submit questions they wished to have asked. Turner's counsel submitted a list of fifteen questions, nine of which were asked by the trial judge.

## A. *Refusal to Allow Counsel-Conducted Voir Dire*

The defendant contends that Code § 8.01-358[3] gives both court and counsel an unconditional right to question prospective jurors directly and that the trial court abridged this statutorily created right by refusing to allow counsel-conducted voir dire. Citing Supreme Court Rule 3A:20(a),[4] the Commonwealth replies that trial courts have discretion in determining whether to permit counsel-conducted voir dire.

The Constitution of Virginia, Art. VI, § 5, prohibits the promulgation of any court rule "in conflict with the general law as the same shall, from time to time, be established by the General Assembly." Supreme Court Rule 3A:20(a) clearly makes the right to counsel-conducted voir dire contingent upon the trial court's approval. In resolving the issue before us, we must determine whether Code § 8.01-358 confers upon attorneys the unconditional right to question prospective jurors directly. If Code § 8.01-358 confers such a right, it

---

[2] Jurors were asked variations of the following questions: "Do you have any religious or conscientious scruples or objections against the imposition of the death sentence?" and "Do you feel that in each and every case, regardless of the facts, where a person is convicted of murder he should receive the death penalty?" Those jurors answering no to both questions were deemed suitable, without further questioning, with respect to their attitude toward the death penalty. Those answering yes to either question were questioned further by the court.

[3] Code § 8.01-358 provides: "The court and counsel for either party may examine under oath any person who is called as a juror therein and may ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein; and the party objecting to any juror may introduce any competent evidence in support of the objection; and if it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case.

"A juror, knowing anything relative to a fact in issue, shall disclose the same in open court."

[4] Supreme Court Rule 3A:20(a) provides that following mandatory questioning by the court as to seven potential grounds for juror exclusion, "the court, or counsel with permission of the court, may examine on oath any prospective juror or may ask any question relevant to his qualifications as an impartial juror."

prevails over that portion of Rule 3A:20(a) which makes the exercise of that right contingent upon the trial court's approval.

The legislative history of § 8.01-358 is useful in discerning whether the General Assembly intended to confer such a right upon attorneys. The Code of 1887 § 3154 required trial courts to question prospective jurors when requested to do so by the litigants.[5] The Code of 1919 § 6000 enlarged a trial court's powers by providing that a court could question jurors even though not requested to do so by counsel.[6] The pertinent language remained unchanged for several decades. *See* Code of 1950 § 8-199 (1950). In 1966, the General Assembly amended Code § 8-199 to read as follows:

> "The court *and counsel for either party* may examine on oath any person who is called as a juror therein *and may ask such person or juror directly any relevant question* to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein; and the party objecting to any juror may introduce any competent evidence in support of the objection; and if it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case."

Acts 166, c. 496, at 676 (language added in 1966 italicized). On June 15, 1971, this court promulgated a comprehensive set of rules governing criminal practice and procedure, to be effective January 1, 1972. One of these rules was Rule 3A:20, which unambiguously gives the trial court discretion in determining whether to allow counsel-conducted voir dire. 211 Va. cvi (1971). Code § 8-199 was recodified as Code § 8-208.28 in 1973 without any change. Acts 1973, c. 439, at 651-52. In another recodification, the texts of Code §§ 8-215 (1957 Repl. Vol.)[7] and 8-208.28 were combined to form the present text of Code § 8.01-358. Acts 1977, c. 617, at 1111.

As both parties recognize, we have not previously resolved whether

---

[5] Code of 1887 § 3154 provided, insofar as is pertinent, that "[t]he court shall, on motion of either party in any suit, examine on oath any person who is called as a juror therein, to ascertain" the juror's qualifications.

[6] Code of 1919 § 6000 provided, insofar as is pertinent, that "[t]he court shall, on motion of either party in any suit, or may of its own accord," examine any prospective juror.

[7] Code § 8-215 (1957 Repl. Vol.) provided: "A juror, knowing anything relative to a fact in issue, shall disclose the same in open court."

the 1966 amendment to this statute confers upon attorneys an unconditional right to participate directly in voir dire. In *Harmon* v. *Commonwealth*, 209 Va. 574, 166 S.E.2d 232 (1969), we held that when a litigant's attorney has agreed that the judge alone would ask the voir dire questions, he or she cannot require the trial judge to exercise that right in a particular fashion. In upholding Harmon's conviction, we concluded that the statutory *permission* for the court to ask such questions directly does not *require* a court to do so. Thus, the trial court was permitted, but not required as contended by Harmon, to question jurors individually. In regard to voir dire conducted by counsel, we noted that the propounding of questions by the trial judge, and not by counsel for the defendant, was "in accordance with the usual practice." 209 Va. at 579, 166 S.E.2d at 236. We also concluded that the word "may" "is not mandatory but permissive and leaves the matter to the discretion of the trial court." 209 Va. at 580, 166 S.E.2d at 236.

Prior to the 1966 amendment, the litigants' counsel had no authority whatsoever for directly participating in voir dire examinations. "Although the statute formerly required the judge alone to ask the questions, in practice most trial courts *permitted* counsel to ask them directly." Boyd, *Practice and Pleading—The Twelfth Annual Survey of Virginia Law: 1966-1967*, 53 Va. L. Rev. 1763, 1781 (1967) (emphasis added). The 1966 amendment "sanction[ed] this deviation and [brought] Virginia in line with the procedure in other jurisdictions." *Id.* Thus, the amendment authorized what was already in fact occurring: counsel's participation in voir dire when permitted by the trial court.

Cognizant that the statutory language might be subject to different interpretations, this court in 1971 promulgated Rule 3A:20(a) of the Rules of Criminal Practice and Procedure. This Rule, which clearly makes counsel's participation in voir dire contingent upon the trial court's approval, resolved any ambiguity present in the statutory language.

Turner suggests that, even if Code § 8.01-358 confers no unconditional right to counsel-conducted voir dire, the trial court abused its discretion in refusing to allow defense counsel to question prospective jurors directly and in not questioning each prospective juror out of the presence of other jurors. While the defendant has a constitutional right to a fair and impartial jury, he has no constitutional right to counsel-conducted voir dire. *See, e.g., United States* v. *Duke*, 409 F.2d 669, 671 (4th Cir. 1969), *cert. denied*, 397 U.S. 1062 (1970).

In the absence of a statute or court rule to the contrary, as long as the selection procedure results in a fair and impartial jury, the manner in which a jury is to be selected is properly within the trial court's sound discretion. Thus, the trial court's refusal to question jurors individually out of the presence of other prospective jurors and the court's refusal to allow counsel-conducted voir dire do not represent an abuse of discretion. *See Dean* v. *Commonwealth*, 209 Va. 666, 669, 166 S.E.2d 228, 230 (1969). We have carefully examined the voir dire conducted by the trial judge and believe it resulted in a fair and impartial jury. Under such circumstances, we cannot say the trial judge abused his discretion.

## B. *Refusal to Ask Specific Questions Proposed by Defense Counsel*

■ As noted previously, the trial court refused to ask several questions proposed by defense counsel.[8] Turner contends that the failure to ask these questions constituted prejudicial error.

The pre-1966 text of what is now Code § 8.01-358 provided that "[t]he court shall, on motion of either party in any suit, examine" jurors to ascertain their qualifications concerning impartiality and lack of bias. The 1966 amendment deleted this requirement, providing merely that "the court . . . may examine [a prospective juror] and may ask [such juror] any relevant question." In *Harmon* v. *Commonwealth*,

---

[8] Of the fifteen questions submitted by defense counsel, one question was withdrawn, nine were asked by the trial judge, and five were refused. These five questions were:

"(10) The defendant, Willie Lloyd Turner, is a member of the Negro race. The victim, W. Jack Smith, Jr., was a white Caucasian. Will those facts prejudice you against Willie Lloyd Turner or affect your ability to render a fair and impartial verdict based solely on the evidence?

(11) Do you feel that if a person is to be given the death penalty for the unlawful killing of another person, such penalty should be given only if such killing is of the most severe and aggravated nature?

. . . .

(13) Do you feel that every person convicted of the unlawful killing of another person during a robbery should receive the death penalty?

(14) Do you feel that every person convicted of the unlawful killing of another person during a robbery should receive the death penalty if there is a probability that the person would commit criminal acts of violence that would constitute a continuing threat to society?

(15) Do you feel that every person convicted of the unlawful killing of another person during a robbery should receive the death penalty if his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder?"

209 Va. at 580, 166 S.E.2d at 236, we held that this statutory language "is not mandatory but permissive and leaves the matter to the discretion of the trial court." With the exception of seven questions, all of which were asked in this case, Rule 3A:20(a) makes voir dire questioning entirely discretionary with the trial court. Unless the refusal to ask a question amounts to a denial of due process or otherwise impinges upon the right to a fair and impartial jury, *see, e.g., Ham* v. *South Carolina,* 409 U.S. 524 (1973), the present wording of Code § 8.01-358 and Rule 3A:20(a) empowers a trial court to use its discretion in determining whether to ask questions proposed by either the Commonwealth or the defendant.

The trial court's refusal to ask the questions proposed by defense counsel did not impinge upon the defendant's right to a fair and impartial jury. While "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant," a trial court's refusal to do so is not constitutionally objectionable in the absence of factors similar to those in *Ham.*[9] *Ristaino* v. *Ross,* 424 U.S. 589, 597 n.9 (1976). The mere fact that a defendant is black and that a victim is white does not constitutionally mandate such an inquiry. *Lewis* v. *Commonwealth,* 218 Va. 31, 35-36, 235 S.E.2d 320, 323 (1977). The refusal of the trial court to ask other questions, those concerning the circumstances under which a prospective juror would vote for the death penalty, likewise is not constitutionally objectionable. The voir dire questioning conducted by the trial judge probed many of the areas touched upon by these questions and assured the removal of those who would invariably impose capital punishment. The court's instructions to the jury clearly delineated the circumstances in which the death penalty could be imposed. Since the questioning actually conducted by the court preserved the defendant's right to a fair and impartial jury, the trial court's refusal to ask the voir dire questions proposed by defense counsel was not an abuse of discretion.

### C. *Examination of Prospective Jurors Concerning Attitudes About Capital Punishment*

For the reasons stated in *Waye* v. *Commonwealth,* 219 Va. 683, 690-91, 251 S.E.2d 202, 207, *cert. denied,* 442 U.S. 924

---

[9] Turner introduced a study indicating that black defendants killing white victims receive the death penalty more frequently than black defendants killing blacks, whites killing blacks, or whites killing whites. The study, however, was based upon statistics compiled in other states and thus was of little utility in establishing the potential of prejudice in Virginia.

(1979), we reject Turner's contention that the trial court should not have questioned prospective jurors concerning their willingness to impose capital punishment.

We likewise believe that the trial court properly struck Samuel Cypress from the venire. After asking Cypress variations of the questions asked of others on the panel,[10] the trial judge concluded that Cypress' objections to capital punishment were absolute. While jurors may not be excluded "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon* v. *Illinois,* 391 U.S. 510, 522 (1968), those jurors irrevocably committed to voting against the death penalty may be excluded. *Coppola* v. *Commonwealth,* 220 Va. 243, 250, 257 S.E.2d 797, 802 (1979), *cert. denied,* 444 U.S. 1103 (1980); *Smith* v. *Commonwealth,* 219 Va. 455, 464, 248 S.E.2d 135, 141 (1978), *cert. denied,* 441 U.S. 967 (1979). The trial court's determination that a juror is irrevocably committed to voting against the death penalty will not be disturbed on appeal unless we can say the prospective juror's commitment against the death penalty was not "unmistakably clear." *Smith* v. *Commonwealth,* 219 Va. at 465, 248 S.E.2d at 141. *Accord, Coppola* v. *Commonwealth,* 220 Va. at 250, 257 S.E.2d at 802. On the basis of the answers given by Cypress, the trial court reasonably concluded he was irrevocably committed against the death penalty.

### D. *Sequestration of the Jury*

■ Turner sought and obtained a change of venue from Southampton County to Northampton County. Upon learning of a recent

---

[10] The complete examination of Cypress appears below:

"THE COURT: Now, Mr. Cypress, do you have any religious or conscientious scruples or objections against the imposition of the death penalty?

MR. CYPRESS: Well, really, I don't go for the death penalty.

THE COURT: Can you say yes or no to that question?

MR. CYPRESS: No.

THE COURT: Or yes?

MR. CYPRESS: Do I have any objection?

THE COURT: Yes.

MR. CYPRESS: Yes.

THE COURT: Is your objection to the death penalty absolute?

MR. CYPRESS: Well, I would say yes.

THE COURT: Could you in a proper case impose the death penalty?

MR. CYPRESS: Didn't hear.

THE COURT: Could you in a proper case impose the death penalty?

MR. CYPRESS: Well, I can't see where it helps any."

Northampton County case involving the death penalty and another murder in the area, defense counsel moved for another change in venue and for sequestration of the jury, both of which were denied. Turner contends that the refusal to sequester the jury was prejudicial error.

As Turner's counsel notes, a judge has discretion in determining whether to sequester a jury. The mere fact of media coverage does not require a judge to sequester a jury. *Thompson* v. *Commonwealth*, 219 Va. 498, 247 S.E.2d 707 (1978). A trial judge's discretion regarding sequestration extends to cases involving capital punishment. We hold that, in the absence of any indication of pretrial prejudicial publicity, a trial judge has wide discretion in deciding whether to sequester a jury.

## III. CONSTITUTIONALITY OF THE DEATH PENALTY PROVISIONS

### A. *Facial Constitutionality*

■ Turner contends that Virginia's statutory provisions concerning the death penalty are facially unconstitutional for reasons previously rejected by us. *See Martin* v. *Commonwealth*, 221 Va. 436, 434-40, 271 S.E.2d 123, 125-26 (1980); *Mason* v. *Commonwealth*, 219 Va. 1091, 1094-95, 254 S.E.2d 116, 118-19 (1979); *Waye* v. *Commonwealth*, 219 Va. 683, 698-99, 251 S.E.2d 202, 211 (1979); and *Smith* v. *Commonwealth*, 219 Va. 455, 476-79, 248 S.E.2d 135, 148-49 (1978). We reaffirm these prior holdings concerning the facial constitutionality of the death penalty statutory provisions.

■ Turner also argues that the imposition of the death penalty on the basis of a jury's conclusion regarding a defendant's propensity for future crime is unconstitutional.[11] The statutory objective of isolating a criminal, according to Turner, can be accomplished through the less drastic measure of life imprisonment. As Turner acknowledges, *Jurek* v. *Texas*, 428 U.S. 262 (1976), upheld as constitutional a Texas statute allowing the imposition of the death penalty where a jury determines, *inter alia*, the defendant would probably commit "criminal acts of violence that would constitute a continuing threat

---

[11] Turner does not contend that the jury had no basis for concluding he would probably commit "criminal acts of violence that would constitute a continuing serious threat to society. . . ." Code § 19.2-264.2. Since 1974, the defendant has been convicted of malicious maiming, escape, unlawful wounding, malicious wounding, and second-degree murder. Four of these offenses occurred in the penal system.

to society." 428 U.S. at 269. While the only issue explicitly addressed concerning a defendant's propensity for future criminal conduct was whether the jury was being asked to resolve a question beyond its competency, 428 U.S. at 274-76, we believe *Jurek* holds that a defendant's propensity for future criminal acts of violence is an acceptable consideration in determining whether to impose the death penalty. *See also Gregg* v. *Georgia,* 428 U.S. 153, 183 n.28 (1976) (plurality opinion).

## B. *Constitutionality as Applied*

Citing *Godfrey* v. *Georgia,* 446 U.S. 420 (1980), Turner contends there was insufficient evidence to support a conclusion that his conduct in committing the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery." Code § 19.2-264.2. As we noted in *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980) (this day decided), *Godfrey* rested upon its unique facts. The *Godfrey* prosecutor conceded the defendant had not tortured the victims or committed an aggravated battery upon them. 446 U.S. at 426. Godfrey had no prior criminal record. Thus, the death sentence rested upon the jury's finding that Godfrey's actions had been "outrageously or wantonly vile, horrible or inhuman in that [they] involved . . . depravity of mind." 446 U.S. at 432. Rejecting such a conclusion as unconstitutional, the Supreme Court of the United States noted several facts: Godfrey's victims, family members who had caused him "extreme emotional trauma," were killed instantaneously; and shortly after the killings Godfrey acknowledged his involvement and the heinous nature of his crimes. Godfrey's crimes were not deemed to reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." In summary, the state had not proven "a principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.* at 433.

The second clause of Code § 19.2-264.2 (hereafter, the "vileness" clause) provides specific criteria which must be met before the death penalty can be imposed on the basis of this clause. The conduct in committing the offense must be deemed to be "outrageously or wantonly vile, horrible or inhuman." Code § 19.2-264.2. Second, the jury must conclude that the conduct establishes one of the following: torture of the victim, an aggravated battery of the victim, or the perpetrator's depravity of mind. *See Hance* v. *State,* 245 Ga. 856, 268 S.E.2d 339 (1980).

In the present case, the Commonwealth established that Turner's conduct was "outrageously or wantonly vile, horrible or inhuman." Turner first shot Smith in the head without warning. After Smith slumped behind the counter, Bain immediately pleaded with Turner not to fire any more. After the defendant had fired one bullet hitting the rear·wall and another one hitting Smith's head, Cosby became nauseous and asked if she could be seated. Rejecting Bain's pleas, Turner then leaned over the counter and fired two bullets into Smith's chest. While Smith was slumped behind the counter, Cosby heard him "gurgling." The evidence also establishes Turner committed an "aggravated battery": a "battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978). After being wounded by Turner, Smith slumped helplessly behind the counter. Unlike Godfrey's victims, Smith did not die instantaneously from a single discharge of a firearm.

Virginia's death penalty statute authorizes the imposition of the death penalty if either the "dangerousness" or "vileness" standard is met. Even if Turner's crime did not meet the "vileness" standard, imposition of the death penalty would be permissible under the "dangerousness" standard.[12] On the basis of Turner's prior criminal record, set forth in footnote 11, the jury could reasonably conclude that the defendant would probably "commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.2.

## IV. REFUSAL TO INSTRUCT THE JURY CONCERNING MURDER IN THE COMMISSION OF AN ATTEMPTED ROBBERY

Code § 18.2-31(d), as noted earlier, provides that murder "in the commission of robbery" while armed with a deadly weapon is capital murder. Code § 18.2-32 provides that murder "in the commission of, or attempt to commit," robbery is first-degree murder. Whereas Code § 18.2-32 is violated by a murder in an attempted

---

[12] As in *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980), the jury returned a sentencing verdict without striking out the inapplicable language ("and" or "or"). Unlike in *Briley*, however, the trial judge in Turner's case refused to ask the jury members, either individually or collectively, whether their sentencing verdict was grounded upon the "dangerousness" or "vileness" standard or both. While the trial judge's refusal was not prejudicial error, it would accord with better practice to determine with certainty the basis for the jury's sentence. Such a procedure would greatly facilitate the process of appellate review.

robbery, Code § 18.2-31(d) is not. To be convicted under Code § 18.2-31(d), the defendant must have committed a robbery.

Turner contends that the jury should have been instructed concerning the lesser offense of first-degree murder because the evidence failed to establish the commission of a robbery. While Turner never had physical possession of the jewelry bags personally, we believe the requirement of asportation has been satisfied in this case. "The degree of asportation necessary to constitute a taking under the common law definition of robbery need be only slight." *Durham v. Commonwealth,* 214 Va. 166, 168, 198 S.E.2d 603, 606 (1973). A perpetrator exercises dominion and control over an object where he commands another to seize the object and the person complies. In this case, Turner at gunpoint commanded Smith and Cosby to place money and valuables into jewelry bags owned by the store. Placing the money and valuables into the bags as requested, Smith and Cosby then put the bags on the counter. Turner exercised dominion and control over the money and valuables when Smith and Cosby asported these items at his command.

## V. DOUBLE JEOPARDY

Citing *Busic* v. *United States,* 446 U.S. 398 (1980), Turner contends that the Double Jeopardy Clause of the United States Constitution[13] was violated when he was convicted of the use of a firearm in the commission of a felony, Code § 18.2-53.1,[14] as well as murder in the commission of a robbery "while armed with a deadly weapon," Code § 18.2-31(d). In *Busic,* the Supreme Court held that 18 U.S.C. § 924(c), providing enhanced punishment for one

---

[13] U. S. Const., amend. V, provides that no one in a criminal case "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."

[14] Code § 18.2-53.1 provides that: "It shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit murder, rape, robbery, burglary, malicious wounding as defined in § 18.2-51, or abduction. Violation of this section shall constitute a separate and distinct felony and any person found guilty thereof shall be sentenced to a term of imprisonment of one year for a first conviction, and for a term of three years for a second or subsequent conviction under the provisions of this section. Notwithstanding any other provision of law, the sentence prescribed for a violation of the provisions of this section shall not be suspended in whole or in part, nor shall anyone convicted hereunder be placed on probation. Such punishment shall be separate and apart from, and shall be made to run consecutively with, any punishment received for the commission of the primary felony."

using or carrying a firearm[15] in the commission of a felony, could not be applied to a defendant using a firearm in the course of a felony that is proscribed by a statute which itself authorizes enhancement if a deadly weapon is used. Both *Busic* and its precursor, *Simpson* v. *United States,* 435 U.S. 6 (1978), were based upon a determination of Congressional intent.

The constitutional prohibition of double jeopardy consists of three separate guarantees: (1) "It protects against a second prosecution for the same offense after acquittal. [(2)] It protects against a second prosecution for the same offense after conviction. [(3)] And it protects against multiple punishments for the same offense." *Illinois* v. *Vitale,* 447 U.S. 410, 415 (1980) quoting *North Carolina* v. *Pearce,* 395 U.S. 711, 717 (1969). In determining whether a defendant has been twice convicted for the "same offense," U. S. Const., amend. V, courts have been guided by the test set forth in *Blockburger* v. *United States,* 284 U.S. 299, 304 (1932): "[T]he test to be applied to determine whether there are two offenses or only one, is whether each [statutory] provision requires proof of a fact which the other does not."

We need not resolve whether one convicted of the use of a firearm in the commission of a felony (Code § 18.2-53.1) and murder in the commission of a robbery while armed with a deadly weapon [Code § 18.2-31(d)] has been convicted twice for the "same offense" under the *Blockburger* test.[16] As noted earlier, the defendant's convictions stem from a single criminal trial. Consequently, only the third constitutional guarantee (the guarantee against multiple punishments) is at issue in this appeal. The constitutional guarantee against multiple punishments "is limited to assuring that the court does not exceed

---

[15] Firearm, as defined in 18 U.S.C. § 921, includes a number of destructive devices not generally deemed to be firearms. *See Simpson* v. *United States,* 435 U.S. at 10, n.4.

[16] The statutory provisions at issue in this case are similar to those at issue in *Wayne County Prosecutor* v. *Recorder's Court Judge,* 406 Mich. 374, 280 N.W.2d 793 *appeal dismissed for want of a substantial federal question sub. nom., Brintley* v. *Michigan,* 444 U.S. 948 (1979) (use of a firearm in the commission of a felony and robbery "while armed with a dangerous weapon.") Under *Hicks* v. *Miranda,* 422 U.S. 332, 343-45 (1975), the Supreme Court's dismissals for want of a substantial federal question are dispositive precedent for those issues presented in a petitioner's appeal. In light of our conclusion concerning the significance of legislative intent on the issue before us, it is unnecessary to determine whether the Supreme Court's dismissal for want of a substantial federal question adjudicated whether felony-firearm and robbery "while armed with a dangerous weapon" constituted the same offense under *Blockburger*.

its legislative authorization by imposing multiple punishments for the same offense." *Brown* v. *Ohio,* 432 U.S. 161, 165 (1977). Where two or more punishments for separate statutory violations are imposed in a single criminal proceeding, "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." *Whalen* v. *United States,* 445 U.S. 684, 698 (1980) (Blackmun, J., concurring).

The General Assembly has clearly indicated its intent to impose multiple punishments for capital murder and use of a firearm in the commission of a felony. Code § 18.2-53.1 provides that a "[v]iolation of this section shall constitute a separate and distinct felony" and that the punishment imposed for violating Code § 18.2-53.1 "shall be separate and apart from, and shall be made to run consecutively with, any punishment received for the commission of the primary felony." This language reflects an unambiguous intent to authorize multiple punishment for a single criminal transaction. Thus, Turner's double jeopardy claim has no merit.

## VI. REVIEW REQUIRED BY CODE § 17.110.1

Code § 17-110.1(C)(1) requires that we consider and determine whether the death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor." We have carefully considered the record in this case and find no indication that the death sentence was the product of these enumerated factors.

Code § 17-110.1(C)(2) requires us, after "considering both the crime and the defendant," to determine whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases." We have reviewed death sentences in those cases involving murder in the commission of a robbery while armed with a deadly weapon. *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57, (1980); *Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980); *Stamper* v. *Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied,* 445 U.S. 972 (1980); *Coppola* v. *Commonwealth,* 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied,* 444 U.S. 1103 (1980). While the atrociousness involved in Turner's murder does not rise to the level evidenced in *Stamper, James Dyral Briley,* or *Coppola,* Turner's murder is just as brutal as the murders in *Linwood Earl Briley* and *Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S.

1049 (1980). Moreover, the defendant's criminal record, detailed in footnote 11, is one of the most extensive we have reviewed under Code § 17-110.1(C). Turner, unlike any of the other defendants except for Mason,[17] had been convicted for a previous murder. Certainly his prior criminal record is as extensive or more extensive than the criminal records of those other defendants sentenced to death for murder in the commission of an armed robbery. Having considered "both the crime and the defendant," Code § 17-110.1(C)(2), we conclude the death sentence is not excessive or disproportionate to the sentences imposed in similar cases.

## VII. OTHER ASSIGNMENTS OF ERROR

For the reasons stated in *James Dyral Briley* v. *Commonwealth, supra,* and *Linwood Briley* v. *Commonwealth, supra,* we reject Turner's contention that a further change in venue was necessary. We likewise reject his argument that photographs of the victim and crime scene should not have been introduced into evidence. *Waye* v. *Commonwealth,* 219 Va. at 692, 251 S.E.2d at 207-08. Moreover, Turner's contention that the jury should have been given an instruction concerning the possibility of parole has no merit. *Stamper* v. *Commonwealth,* 220 Va. at 278, 257 S.E.2d at 821; *Clark* v. *Commonwealth,* 220 Va. at 214, 257 S.E.2d at 792.

Turner raises several other assignments of error, discussed neither in his brief nor in oral argument. After examining each of these assigned errors, we conclude that they have no merit and require no further discussion.

Having given the defendant's case both appellate and independent review, we conclude there is no reversible error in either his convictions or sentences, and we find no other reason to disturb or commute his death sentence. Therefore, we affirm the judgments pronounced by the trial court.

*Affirmed.*

---

[17] *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979).