HERMAN CHARLES BARNES

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 870013 and 870014

September 4, 1987

Present: All the Justices

*Sa'ad El-Amin* for appellant.
*Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

At a bench trial, Herman Charles Barnes was convicted of the capital murders of Clyde Jenkins and Michael Mohammed Afifi pursuant to the multiple homicide provisions of Code § 18.2-

31(g). He was also convicted of abduction for pecuniary benefit, in violation of Code § 18.2-48, and was sentenced to 50 years in prison; use of a firearm in the commission of an abduction, in violation of Code § 18.2-53.1, and was sentenced to 2 years in prison; attempted robbery, and was sentenced in accordance with Code §§ 18.2-26 and 18.2-58 to 10 years in prison; and use of a firearm in the commission of an attempted robbery (second or subsequent offense), in violation of Code § 18.2-53.1, and was sentenced to 4 years in prison. After receiving the report of a probation officer and hearing further evidence, the court imposed the death sentence for capital murder by a final order entered September 26, 1986.

Barnes' death sentence is before the Court pursuant to the automatic review provisions of Code § 17-110.1. We have consolidated that review with the defendant's appeal of his capital murder conviction. In addition, by order dated January 7, 1987, we have certified from the Court of Appeals of Virginia the record of the related convictions pursuant to Code § 17-116.06 and have given the cases priority on our docket.

## I. THE EVIDENCE

The case was submitted to the trial court on a stipulation covering most of the facts. The Commonwealth offered some additional testimonial evidence and exhibits without objection. The defense offered no evidence.

On June 27, 1985, at approximately 10:00 p.m., Ricky Adams, an employee of a food market in Hampton, was sweeping the parking lot outside the market. Barnes, who was wearing a woman's stocking as a mask, walked up to Adams, unobserved, and pushed a pistol against Adams' side. He ordered Adams to enter the store as if nothing extraordinary was occurring. The store was in the process of being closed and the doors were locked when Adams approached the door with Barnes hidden behind him.

Clyde Jenkins, the 73-year-old owner of the store, saw Adams approach and unbolted the door to let him in. Barnes entered the store behind Adams. Jenkins grappled with Barnes and a struggle ensued. Barnes broke free from Jenkins and fired two shots from the .38 caliber revolver he was carrying. One shot penetrated Jenkins' chest, collapsing the left lung and perforating the aorta. The other shot entered the abdomen and lacerated the liver. Jenkins fell backward to the floor. At that point, another employee,

Michael Mohammed Afifi, ran from the back of the store and jumped on Barnes' back. Again Barnes broke free. He fired a shot into Afifi's left arm and side which penetrated both lungs and ruptured the aorta. Afifi died soon thereafter of massive internal hemorrhaging.

Barnes then turned and pointed the gun at Adams, but at that moment Jenkins stirred and attempted to rise from the floor. Barnes shot Jenkins a third time and fled the store. The third shot struck Jenkins in the neck, damaging his spinal cord and causing near-total paralysis. Jenkins died, after a "stormy hospitalization" lasting over two weeks, of pneumonia complicated by liver and renal failure resulting primarily from the injuries inflicted by the first two wounds.

Barnes fled to Philadelphia, where he received permission to stay in an apartment occupied by his stepfather. On July 1, 1985, the Philadelphia police were notified that Barnes was wanted in Hampton for two murders. Virginia arrest warrants were sent to Pennsylvania and Pennsylvania arrest warrants were also issued. Thereafter, the police received an anonymous tip that Barnes was in Philadelphia and that his girlfriend, who lived in that city, knew his whereabouts. The police first contacted Barnes' girlfriend on July 26, 1985. Initially, she denied any knowledge of Barnes' whereabouts. Later, however, she told police that Barnes was staying in West Philadelphia and that she had been taken to visit him on the previous day. She told the police that she could point out the apartment. On that same day, the girlfriend led police to an apartment building and pointed to a window of the apartment where she had visited Barnes. The police also had information that Barnes had recently made calls from a public telephone booth near that building. After pointing to the window, the girlfriend immediately ducked down in the car out of fear of being seen. She was taken from the area in another police car.

The police located the position of the apartment within the building. They approached the door armed with arrest warrants for Barnes, knocked, and identified themselves as police. They heard a television and someone moving inside the apartment, but the door was not answered. After knocking again, they broke down the door and searched the apartment. They found Barnes hiding under the kitchen sink behind the closed doors of a cabinet. They arrested him and took him to a police station but removed nothing else from the apartment.

At the police station, Barnes admitted being at the food market in Hampton on the night of the killings. He further admitted that he and an accomplice had intended to rob the store but he denied being the triggerman and blamed the killings on his accomplice.

## II. ASSIGNMENTS OF ERROR

### A. *Trial Court's Reliance Upon a Transcript From the Preliminary Hearing*

Barnes contends that, in deciding this case, the trial court erred in considering the transcript of the testimony given at the preliminary hearing by Ricky Adams, the young man whom Barnes had used as a decoy to gain entry to the store. According to Barnes, the transcript was never admitted into evidence and was improperly considered by the trial court.

One aspect of the stipulation submitted by the parties stated that "[t]he Commonwealth will not object to the defendant's introduction of a copy of the full direct and cross-examination of Ricky Adams from the preliminary hearing conducted in this matter March 28, 1986." The record shows that Barnes' counsel urged the court to consider the transcript. Barnes' counsel now complains of the court's doing just that.

After the Commonwealth advised the trial court of the stipulation concerning the preliminary hearing transcript, the court inquired if there were any objections to consideration of the transcript. The defense made no objection, but referred the court to the appropriate pages to be read.

The Commonwealth formally offered the transcript in evidence before resting its case. Again, the defense made no objection, but stated to the court: "you need to read this for your own benefit." The court then recessed in order to read the transcript, again without objection. Later, the defense moved for a mistrial because the transcript had not been offered in evidence by the *defense*. We hold that the defense waived any objection to the admission of the transcript in evidence, and that the Court correctly denied the motion for mistrial.

### B. *Suppression of Barnes' Partial Confession*

Barnes next contends that the partial confession he gave to the police in Philadelphia should have been suppressed as the "fruit of the poisonous tree" because it was the product of a warrantless

entry and search of his stepfather's apartment. We disagree for two reasons.

■ First, the entry and search were not warrantless. Although they had no search warrant for the premises, the police had valid arrest warrants for Barnes. They had reason to believe that Barnes was staying in the apartment and was actually present, and the arrest warrants gave them the limited authority to enter the apartment, search for the person described in the warrants, and arrest him. *See Payton* v. *New York*, 445 U.S. 573, 590 (1980). They did no more than that. *Cf. Steagald* v. *United States*, 451 U.S. 204, 219 (1981) (subject of an arrest warrant cannot complain of absence of search warrant when he is arrested in home of another, but residents of home not named in warrant have Fourth Amendment protection from search for anything other than subject of warrant).

■ Second, Barnes had the burden of showing that he had a legitimate expectation of privacy in the apartment in which he was arrested so as to confer upon him standing to challenge the entry and search. *Rakas* v. *Illinois*, 439 U.S. 128, 131 (1978). He failed to carry that burden. The evidence shows only that he had permission to be present in the apartment. It fails to show that he had a key, that he kept property there, or that he had any right to exclude others. The Supreme Court has expressly held that the mere right to be present is insufficient to confer standing to invoke the Fourth Amendment protections to which a dwelling is entitled. *Rakas*, 439 U.S. at 142-43.

## C. *Proof of Premeditation*

■ Barnes also argues that the Commonwealth failed to prove premeditation in the killings of Jenkins and Afifi. Barnes contends that he was provoked into shooting the victims by their physical resistance, and that provocation establishes the absence of willfulness and premeditation. We reject Barnes' attempt to portray himself as a victim of attacks which he had to fend off by shooting Jenkins and Afifi. Barnes cites *Bailey* v. *Commonwealth*, 191 Va. 510, 62 S.E.2d 28 (1950), in support of his provocation theory. That case is factually inapposite. It did not begin as a criminal enterprise. It involved two men engaged in an argument which escalated to pushing and shoving, and then to blows. Bailey ultimately stabbed the other man. We stated that, under those circumstances, the question of provocation was a question of fact for

the jury, and not a question of law for the court. Here, we decide, as a matter of law, that one who, armed with a deadly weapon, approaches others intending to rob them, will not be heard to assert that he was provoked by the resistance of his victims to his criminal enterprise.

The question of premeditation is usually one for determination by the trier of fact from all the facts and circumstances of the case. *Clozza* v. *Commonwealth*, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985); *Epperly* v. *Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892 (1982); *Smith* v. *Commonwealth*, 220 Va. 696, 701, 261 S.E.2d 550, 553 (1980). The intention to kill need not exist for any specified length of time prior to the actual killing. *Akers* v. *Commonwealth*, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980).

In this case, the fact-finder was entitled to consider the circumstances that Barnes, masked and armed with a loaded revolver, entered the store by coercion with intent to commit robbery; that he fired two shots into the body of Jenkins, an unarmed 73-year-old man who offered resistance; that he then shot and killed Afifi, an unarmed young man who offered resistance; that he then pointed his weapon at Adams, the only remaining person present, who was offering no resistance, that he might well have killed again had he not been distracted by the efforts of the mortally wounded Jenkins to rise from the floor; and that he then took aim again at Jenkins and fired a shot into his neck, paralyzing him. From these circumstances the trier of fact could well infer that Barnes intended to eliminate all resistance to his criminal enterprise by killing the victims, and perhaps also to eliminate witnesses by killing all present, until he fled the store in a panic. We hold that the evidence fully supports the trial court's finding that the killings were willful, deliberate, and premeditated.

### D. *Proof of Abduction For Pecuniary Benefit*

Barnes argues further that the evidence was insufficient to prove that he abducted Ricky Adams for pecuniary benefit, a prerequisite for conviction under Code § 18.2-48. We do not agree.

■ Barnes seized Adams in the parking lot and used him as a decoy to gain access to the store which, by Barnes' own admission, he intended to rob. Barnes argues that because he released Adams once he was inside the store, he cannot be found guilty of abduction for pecuniary benefit. However, in our view, Barnes' conduct falls squarely within the ambit of the statute. The statutory element is the *intent* to extort money or obtain a pecuniary benefit. It is not necessary that the criminal actually succeed in realizing his desired gain. In *Cortner* v. *Commonwealth*, 222 Va. 557, 561, 281 S.E.2d 908, 910 (1981), we held that using an individual as a shield to facilitate an escape from the scene of a robbery violated the statute in question. We hold today that abducting a person as a means of gaining access to the scene or otherwise facilitating the commission of an intended robbery likewise violates the statute.

### E. *Motion To Preclude The Death Penalty As Racially Discriminatory*

■ Barnes contends that the trial court erred in denying his motion to preclude imposition of the death penalty. The motion was based on a statistical study published in a law review article suggesting that racial factors may have influenced the imposition of the death penalty in the 1970's. As Barnes' counsel conceded during oral argument, this precise issue was resolved by the United States Supreme Court in *McCleskey* v. *Kemp*, 481 U.S. ____, 107 S.Ct. 1756 (1987). We hold that the trial court did not err in denying the motion to preclude imposition of the death penalty on that basis.

### F. *Proof of Vileness*

Code § 19.2-264.2 provides, in pertinent part:

[A] sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

Here, the court did not find that the Commonwealth had proved a factual basis for the "future dangerousness" predicate, but the court did make a finding that Barnes' "conduct in committing the offense was outrageously and wantonly vile . . . in that it did involve an aggravated battery to the victim." Barnes argues that the evidence fails to support this finding.

In oral argument at the bar of this Court, defense counsel made the contention that, because capital murder was premised upon multiple homicides under Code § 18.2-31(g), both the killings of Jenkins and Afifi must be found to meet the vileness predicate before the death penalty may be imposed. We do not so construe the statutory scheme.

Code § 19.2-264.2, quoted above, is a procedural statute containing rigorous safeguards against the application of the death penalty to cases in which the legislature deems it unwarranted. It does not deal with the substantive classification of offenses, that being the function of Title 18.2 of the Code. Even though Code § 18.2-31 may classify an act as capital murder, the death penalty may not be imposed unless the requirements of § 19.2-264.2 are met. Having found a defendant guilty of a crime classified by § 18.2-31 as capital murder in the first part of a bifurcated trial, the trier of fact then turns to § 19.2-264.2, in a subsequent proceeding, to determine whether imposition of the death penalty is appropriate. Code § 19.2-264.3(C). At that point, the tests required by Code § 19.2-264.2 are the sole criteria governing the application of the death penalty. Those tests contain no requirement that, in the case of multiple homicides, all killings must meet the test of vileness before the ultimate penalty may be imposed, and we discern no legislative intent within the statutory framework to impose such a requirement. Where the "vileness" predicate is under consideration, the manifest legislative purpose is to punish and deter any conduct which meets that standard. We conclude that if the killing of any victim in a multiple homicide meets the test of Code § 19.2-264.2, the death penalty may be imposed.

The Commonwealth makes no contention that the one-shot killing of Afifi fulfills the "vileness" predicate, but argues that the three shots fired into the body of Jenkins constitute an "aggravated battery," which meets the statutory test of "vileness."

We have construed "aggravated battery," in the context of Code § 19.2-264.2, "to mean a battery which, qualitatively and

quantitively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

We have, in several cases, found the cumulative effect of multiple gunshot wounds to constitute an "aggravated battery" within the definition formulated by *Smith*. In *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981), a robber of a jewelry store shot a store clerk in the head. Another occupant of the store tried to dissuade the robber from firing again. Stating that he intended to kill the clerk because he had triggered a silent alarm, the robber leaned over the counter and fired two more shots into the clerk's chest. The latter two shots proved fatal. We held that this unnecessarily repetitive shooting met the *Smith* definition of an "aggravated battery."

In *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986), we considered two killings bearing a marked similarity to the present case. Watkins entered a store and shot a clerk twice. After a confederate removed a cash drawer, Watkins leaned over the counter and fired two more shots into the body of the clerk. About a week later, Watkins entered another store, shot a clerk twice, removed a cash drawer and a wallet, then went behind the counter and fired two more shots into the clerk's body. In neither case could the Commonwealth establish whether the shots which caused the deaths had been fired first, last, or in between. We held that the *Smith* definition of aggravated battery was met for two reasons: (1) there was an appreciable lapse of time between the shots, and (2) death was not instantaneous. *Id*. at 490, 331 S.E. at 437. *Compare Godfrey* v. *Georgia*, 446 U.S. 420 (1980) (aggravated battery not proven where victim killed instantaneously by single gunshot wound).

Our statutory scheme contains no requirement that the Commonwealth prove the order in which multiple gunshot wounds were inflicted in order to establish which caused death, or indeed, whether death might not have resulted if any wound had been avoided. The "more culpable than the minimum" standard articulated in *Smith* contains no such requirement, and we decline to impose such a requirement now. Consistent with our holding in *Watkins*, we hold that a killing inflicted by multiple gunshot wounds may constitute an "aggravated battery" within the mean-

ing of Code § 19.2-264.2 where there is an appreciable lapse of time between the first shot and the last, and where death does not result instantaneously from the first.

In this case, after Barnes had shot Jenkins in the chest and abdomen, he had time to grapple with Afifi, shake him off, aim his weapon and shoot Afifi, turn, aim his weapon at Adams, turn again, aim his weapon at Jenkins, and fire his final shot into Jenkins' neck. Jenkins lived on in the hospital, suffering from his wounds, for over two weeks before he died. We have no difficulty in upholding the trial court's finding that these facts constituted an aggravated battery meeting the statutory "vileness" predicate.

## III. SENTENCE REVIEW

Pursuant to Code § 17-110.1(C), we must make an independent review of the record to determine whether the death penalty was imposed under the influence of passion, prejudice, or other arbitrary factor. Our examination of the record reveals no such improper influence. Further, we are required to determine whether the death sentence in this case is excessive or disproportionate to the sentences imposed in similar cases. To that end, we have accumulated and reviewed the records in all capital murder cases reviewed by this Court since the present statutes became effective, giving particular attention to cases in which the death penalty was based on the "vileness" predicate, *e.g., Justus* v. *Commonwealth*, 222 Va. 667, 283 S.E.2d 905 (1981), *cert. denied*, 455 U.S. 983 (1982); *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980). It is unnecessary to repeat here the comparison with *Turner* and *Watkins* set forth in the preceding section of this opinion. We conclude that the sentence here is not excessive or disproportionate to sentences generally imposed by juries in Virginia for similar crimes.

Finding no reversible error in either record and determining that imposition of the death penalty was warranted, we will affirm the judgments of the trial court.

Record No. 870013 *Affirmed.*
Record No. 870014 *Affirmed.*

THOMAS, J., concurring in part and dissenting in part.

In my opinion, the death sentence in this case should have been commuted to one of life imprisonment. This is so because the Commonwealth failed to prove beyond a reasonable doubt that the defendant's conduct in killing Jenkins met the legal definition of vileness.

Jenkins' murder was deplorable. I do not condone anything that this criminal defendant did. He is deserving of punishment. But under our system of law, the use of the death penalty as punishment is narrowly circumscribed. Here, the Commonwealth simply showed that Jenkins was shot three times and then demanded the death penalty. Virginia law requires more than that.

Under Virginia's statutory scheme, a defendant convicted of capital murder cannot be sentenced to death unless it is first established beyond a reasonable doubt that he presents a future danger to society *or* that his conduct in committing capital murder is vile. Here, the trial court specifically found that Barnes did not present a future danger to society. The death penalty in this case rested solely on vileness.

In Virginia, there are three ways to establish vileness: (1) proof of torture, (2) proof of depravity of mind, *or* (3) proof of an aggravated battery to the victim. In this case, the trial court did not rest its decision upon either torture or depravity of mind. Here, the trial court concluded that the defendant's conduct was vile solely because it involved what the court considered to be an aggravated battery to the victim.

"Aggravated battery," as used in the vileness test, is a defined phrase. In *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979), this Court said that aggravated battery is "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." The gravamen of *Smith* is that once the assailant has inflicted a disabling, incapacitating, potentially fatal wound which leaves his victim helpless, defenseless, and unable to flee or fight, then to inflict any additional wounds constitutes aggravated battery. Thus, in order for the Commonwealth to secure the death penalty in this case, it was bound to prove the factors set forth in *Smith*. In my opinion, there was a failure of proof.

The Commonwealth's argument on brief gives a first indication of the weakness of the case concerning vileness. The Commonwealth contended that Jenkins' murder was vile because the defendant shot Jenkins a third time after Jenkins already was seriously wounded *and* because the defendant also shot Afifi. Virginia's statutory scheme does not permit the blending together of the facts from two killings in deciding whether one killing was vile. Each murder must be examined separately and a separate determination of vileness must be made for each one. The Commonwealth's attempt to prove that Jenkins' murder was vile by pointing to Afifi's murder signals the general problems that exist on this issue.

In oral argument, the Commonwealth backed away from the position it took on brief and argued, instead, that the third shot made Jenkins' murder vile. But nothing in the record supports the argument that the third shot was *more culpable than the minimum necessary to accomplish the act of murder.* Indeed, the evidence shows that it was the combined effect of all three shots that killed Jenkins.

Jenkins was shot in the neck, chest, and abdomen. The autopsy report listed the cause of death as follows: "sepsis, respiratory, hepatic and renal failure due to neck, chest *and* abdominal gunshot wounds." (Emphasis added.) In his testimony, the assistant medical examiner who performed the autopsy made clear that Jenkins died from the effects of all three wounds. He testified as follows: "*All of these wounds* produced initially some low blood pressure, which contributed to his multi-organ failure, his lungs failing and subsequently his liver, kidneys, and, of course, terminally his heart." (Emphasis added.) Given the foregoing evidence, there was no basis upon which a trier of fact could have concluded, as the Commonwealth theorizes, that the third shot went beyond the minimum necessary to commit murder. It may be that Jenkins' murder fell within the ambit of *Smith*, but the Commonwealth made no effort to prove that it did. And absent such proof, the death penalty cannot be imposed.

There are at least two major problems with the majority opinion on the vileness issue. The most critical is the redefinition of aggravated battery. The majority redefines that phrase in a manner that fits the facts of the instant case while silently overruling the long-established test set forth in *Smith*, which was the law at the time of the offense and at the time of trial. *Smith* required an

analysis of whether the defendant's conduct exceeded the minimum necessary to kill. The majority's new test eliminates that inquiry. With today's opinion, aggravated battery can now be shown where there "is an appreciable lapse of time between the first shot and the last, and where death does not result instantaneously from the first."

Significantly, this wholesale change in the definition of aggravated battery takes place without the benefit of briefing or argument. Neither the Commonwealth nor the defendant sought such a definition. The Commonwealth's only argument was that *Smith* applied and *Smith* was met. What happened here is akin to *ex post facto* legislation. Because the Commonwealth failed to prove that which was required by *Smith*, the majority simply abandoned *Smith* and announced a new test — never before seen in Virginia law — which the Commonwealth could meet.

The second major problem is that even though the majority abandons *Smith*, it nevertheless attempts to portray the facts in a manner that implies compliance with *Smith*. The majority suggests that the first two shots were fatal, thus, intimating that the third shot exceeded the minimum necessary to commit murder. The majority writes as follows: "Jenkins died, after a 'stormy hospitalization' lasting over two weeks, of pneumonia complicated by liver and renal failure resulting primarily from the injuries inflicted by the first two wounds." It is certainly true that Jenkins' liver and renal failure resulted primarily from the first two shots. It cannot be stated, however, based on this record, that it was the first two shots which were primarily responsible for Jenkins' death. Any such suggestion is refuted by the autopsy report and the testimony of the assistant medical examiner.

Further, the majority's reliance upon *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986), and *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981), is misplaced. Neither case involved the precise question raised here of proof of vileness based solely on proof of aggravated battery. As a result, neither case involved a critical analysis of *Smith*. In addition, the death sentence in *Turner* was based on future dangerousness *and* vileness; the same was true in *Watkins*.

Moreover, the facts in both cases clearly met the burden imposed by *Smith*. As noted above, *Smith* focuses upon whether a defendant continued to inflict wounds upon a helpless, defenseless

victim. In *Turner* and in *Watkins*, the victims were helpless, defenseless, and unable to flee or fight at the time additional shots were fired into their bodies. At the time those victims received additional wounds, they presented no threat whatever to their assailant. In the instant case, though Jenkins was seriously wounded, the evidence does not show that he was helpless, defenseless, and unable to flee or fight when the third shot was fired. In fact, at the time of the third shot Jenkins was attempting to stand up. The helplessness and defenselessness of the victim is the unifying theme in all the previous aggravated battery cases. This seemingly small difference in the facts has heretofore marked the boundary line between cases in which the death penalty was warranted and cases in which it was not. Today, the majority obliterates that line.

POFF, J., joins concurring in part and dissenting in part.