COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Huff,[*] AtLee and Ortiz
Argued by videoconference


JORDAN ANDERSON
                                                    MEMORANDUM OPINION[**] BY
v.        Record No. 1254-23-4                      JUDGE RICHARD Y. ATLEE, JR.
                                                        FEBRUARY 25, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Kimberly A. Irving, Judge

Brett Blobaum, Senior Appellate Attorney (Michelle C.F. Derrico,
Senior Appellate Attorney; Virginia Indigent Defense Commission,
on briefs), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a trial, a jury found Jordan Anderson guilty of second-degree murder, robbery,

attempted robbery, armed statutory burglary, 2 counts of aggravated malicious wounding, 17 counts

of abduction for pecuniary benefit, and 22 counts of using a firearm in the commission of a felony.[1]

On appeal, he raises multiple issues. First, he argues that the trial court erred by refusing to instruct

the jury on the lesser-included offense of voluntary manslaughter.[2] Second, he argues that the trial

_____

[*] Judge Huff participated in the hearing and decision of this case prior to the effective date
of his retirement on December 31, 2024.

[**] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Anderson does not challenge his convictions for attempted robbery, robbery, and one
count of aggravated malicious wounding. Nor does he challenge the three use of a firearm
convictions associated with those convictions. Anderson also does not challenge his conviction
for statutory burglary.

[2] Anderson also challenges the related conviction for use of a firearm in the commission
of a murder.

court erred when it refused to merge the charges of aggravated malicious wounding and murder, which he contends violates double jeopardy protections. Third, he argues the trial court erred by denying his motion to strike the abduction charges because the abductions were inherent in the robbery and attempted robbery convictions. Finally, Anderson argues that because his convictions for abduction should have been struck, so should the associated convictions for use of a firearm in the commission of an abduction. We disagree and affirm his convictions.

## I. BACKGROUND

"On appeal, we state the facts in the light most favorable to the Commonwealth," the prevailing party below. *Newsome v. Commonwealth*, 81 Va. App. 43, 48 (2024).

Early in the morning on December 26, 2019, Anderson, along with his accomplice, walked into a Denny's restaurant in Manassas, Virginia, dressed in dark clothes and face masks. Anderson carried a firearm, and his accomplice carried a baton. As they entered the restaurant, they yelled at everyone to get down on the ground. The men ordered everyone to hand over their cellphones, and Anderson's accomplice went around collecting the phones. Anderson moved around the restaurant directing the employees to come to the front of the restaurant and join the customers on the ground.

### A. *The Abductions*

When Anderson and his accomplice entered the restaurant, there were multiple customers. Bradley Sheetz, Leyla Shafag, and M.A.[3] were sitting together at a table. Anderson yelled at them to get on the ground and he put his firearm against Shafag's head. Sheetz handed over his cellphone, and all three individuals got down on the ground. Sheetz sat on the ground next to the table, while Shafag and M.A. sat under the table.

---

[3] We identify the minors, M.A. and A.Q., by their initials to protect their privacy.

Roberto Gonzalez, Esperanza Medina, Mariana Medina, and Jazlyn Riveros Vasquez were sitting together. Gonzalez heard the men ask people to put their cellphones on the table. When told to do so, Gonzalez placed his phone on the table before joining his companions under the table. After a while, Gonzalez heard two or three gunshots, but he did not see the shots. The four of them remained under the table until Anderson and his accomplice left.

Nearby, Jairo Andino, Jeslyn Andino, A.Q., and Marisol Romero sat together. Upon hearing loud noises, Jairo looked up and saw Anderson pointing a gun in his direction. He heard the men tell everybody to hand over "our phones, like all of our possessions, and place them on the table." He handed over his phone, and he testified that he remembered the men collecting all the belongings from his table. Jairo could not remember whether the men directed him to get under the table or whether he did so on his own, but he got on the floor and told his companions to get under the table as well. He remembered hearing one of the men "getting angry" and saying "that they wanted to shoot someone or kill someone because of how angry they were." He heard gunshots, but he could not recall exactly how many.

Along with the customers, several employees were also in the restaurant at the time Anderson entered. Esther Jacinto was working in the back as a dishwasher when Anderson came into the back with a firearm. He asked Jacinto for her phone, but she did not have it with her. He also asked where her "boss" was, and she responded that she did not know. Anderson then moved her to the front of the restaurant with the customers and pushed her to the ground. She stayed there until the police arrived.

Ysnia Guardado also worked as a dishwasher. She testified that Anderson grabbed her around the neck with his left hand and pointed a gun at her head. He then moved her from the bathroom area to "the other side of the kitchen," which was the back area of the restaurant normally used for seating customers. He told her to lie face down on the floor and not move.

Esperanza Guardado Guardado was working as a server.  Anderson came into the kitchen, pointed a gun at her and the cook, and asked them where the manager was.  When neither knew, he told them to go to the front of the restaurant and ordered them to lie on the floor.  Maria Medina was working as a cook.  She testified that she saw someone with a gun as she walked out of the refrigerator.  Anderson asked why she was looking at him and pointed the gun at her.  He turned her around, put the gun to her head, moved her to the front of the restaurant, and threw her to the ground.

Ana Ramirez and Kathleen Shanahan were also working as servers that night.  Both heard the men yell at everyone to get down on the ground, and both complied.  Shanahan saw Anderson's firearm pointed at her.  He asked her where the manager was, but she did not know.

B. *The Robberies*

Relevant to this appeal, Anderson was convicted of the robbery of Gonzalez and the attempted robbery of Jennifer Jaramillo.  Gonzalez testified that when he placed his phone on the table, he also emptied his pockets, placing his keys and wallet on either the table or the seat of the booth where he had been sitting.  The surveillance video shows Anderson's accomplice taking Gonzalez's wallet from the seat of the booth.  Gonzalez and his companions remained under the table for a few minutes until Anderson and his accomplice left the restaurant.

Jennifer Jaramillo was a server at Denny's.  She was getting ready to leave after her shift when Anderson approached her, pointed a gun at her head, and told her to get down on the ground. He then put the gun to her head and asked her for the password for the computer, but she did not know it.  He also asked where her manager was, but she did not know.  Anderson went to the back, and Jaramillo was scared so she stayed on the floor.  The men came back without finding the manager, and she testified that they tried to leave.

- 4 -

C. *Shooting*

The men did not find the manager or get into the computer. Sheetz testified that Anderson seemed "pissed off," and he heard Anderson say, "[s]omeone's going to fucking die tonight." He saw Anderson chamber a round into the firearm. Jairo also heard one of the men saying that he "wanted to shoot someone or kill someone because of how angry they were." When the accomplice started running out the door of the restaurant, Anderson initially followed him. But Anderson looked at Sheetz, aimed the gun at Sheetz, and pulled the trigger. The bullet hit Sheetz in the abdomen.[4] Anderson then continued to the door.

As the two men ran out the door, Yusuf Ozgur tried to enter the restaurant. Anderson's accomplice, who exited first, hit Ozgur as Ozgur tried to get out of the way. As Anderson followed his accomplice out, he shot Ozgur. Anderson later claimed that he thought Ozgur "was trying to stop" them from leaving. Ozgur subsequently died from his injuries.

D. *The Trial*

Prior to trial, Anderson sought to dismiss the indictments for both the abductions and the use of a firearm charges related to the abductions. He argued that the abduction charges violated constitutional double jeopardy protections because the abductions were intrinsic to the robbery offenses. The trial court ruled that the charges related to the "individuals who have nothing but the abduction are fine," but it was hesitant to dismiss the remaining indictments prior to hearing evidence. It noted that the issue could be raised again in a motion to strike.

After the Commonwealth rested its case, Anderson filed a written motion to strike. He again argued that the abductions were incidental to the robberies. His motion to strike focused on

---

[4] Sheetz survived the shooting.

the robberies related to the attempted robbery of Jaramillo, the employee of Denny's as custodian of Denny's property. Ultimately, the trial court denied the motion to strike.[5]

Anderson also challenged his charges for both murder and aggravated malicious wounding stemming from the shooting of Ozgur. He argued that it violated double jeopardy to charge both, saying that "[t]he legislature could not have intended for a single gunshot to carry both of those offenses." The court denied the motion to strike.

During Anderson's case, he presented the expert testimony of Dr. Lucy Guarnera, a forensic and clinical psychologist, specializing in traumatic stress. Dr. Guarnera conducted a forensic evaluation of Anderson, and she watched the videos of his interrogations and the surveillance video from the Denny's incident. She testified that she diagnosed Anderson with an "Other Specified Trauma or Stressor[-]Related Disorder." She testified that hypervigilance was a common symptom, and Anderson's reactions during the robbery were consistent with hypervigilance and a "heightened perception of threat." She testified that people with this condition can interpret "benign or ambiguous actions" in "a negative or threatening manner," leading to them "reacting rather than thinking."

After the conclusion of the presentation of evidence, Anderson proffered Jury Instruction U, which, in addition to instructions on first- and second-degree murder, included an instruction on manslaughter. The trial court questioned whether there was more than a scintilla of evidence to support the manslaughter part of the instruction, asking, "how are we getting heat of passion here?" Anderson argued that he did not necessarily need heat of passion, only an intentional killing without malice. The Commonwealth argued that there was no evidence of provocation, which was the core of involuntary manslaughter. The trial court refused the instruction.

---

[5] The trial court granted the motion to strike the abduction charge that related to Jaramillo, finding that her detention was inherent in the attempted robbery. But it denied the motion to strike the remaining abduction charges.

The jury convicted Anderson of 17 counts of abduction with intent to gain pecuniary benefit, 17 counts of use of a firearm in the commission of an abduction, 2 counts of aggravated malicious wounding, 2 counts of use of a firearm in the commission of aggravated malicious wounding, 1 count of second-degree murder, 1 count of use of a firearm in a murder, 1 count of robbery, 1 count of attempted robbery, 2 counts of use of a firearm in the commission of a robbery, and 1 count of armed burglary. The trial court sentenced Anderson to 688 years in prison with 467 years suspended. Anderson now appeals.

## II. ANALYSIS

### A. *Jury Instructions*

Anderson argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of voluntary manslaughter.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Conley v. Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)). We review the trial court's decision to grant or deny a jury instruction for an abuse of discretion. *Id.* at 675. A "[j]ury instruction[ is] properly refused if not supported by more than a scintilla of evidence." *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) (first alteration in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). When evaluating whether the evidence "amounts to more than a scintilla, 'we must look at the evidence in the light most favorable to [appellant]." *Id.* (alteration in original) (quoting *Herbin v. Commonwealth*, 28 Va. App. 173, 181 (1998)).

Anderson contends that the enactment of Code § 19.2-271.6, which permits the introduction of evidence of the mental condition of the defendant to challenge whether the defendant had the

requisite intent to commit the offense, changed how heat of passion is evaluated.[6] He points to Dr. Guarnera's testimony and argues that there was sufficient evidence that his mental condition left him "unable to evaluate what happened between his codefendant" and Ozgur. Thus, he contends that, in light of his mental condition, there was evidence that he acted in the heat of passion and without malice, thus justifying the involuntary manslaughter instruction.

"A killing done in the heat of passion and upon reasonable provocation will reduce a homicide from murder to voluntary manslaughter." *Rhodes*, 41 Va. App. at 200. "Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). Heat of passion will exclude malice when "provocation reasonably produces fear that causes one to act on impulse without conscious reflection." *Id.* "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear or a combination of both." *Rhodes*, 41 Va. App. at 200-01 (quoting *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986)). The provocation must be objectively reasonable under the circumstances. *Stewart v. Commonwealth*, 245 Va. 222, 240 (1993). "In order to determine whether the [person] acted in the heat of passion, it is necessary to consider the nature and degree of provocation as well as the manner in which it was resisted." *Robertson v. Commonwealth*, 31 Va. App. 814, 823 (2000) (quoting *Miller v. Commonwealth*, 5 Va. App. 22, 25 (1987)). Further, to support a finding of heat of passion, it must have been the "victim of the crime who invoked the defendant's heat of passion." *Arnold v. Commonwealth*, 37 Va. App. 781, 789 (2002).

---

[6] The Commonwealth argues that Anderson's argument is procedurally barred because he did not make this argument in the trial court. *See* Rule 5A:18. Although Anderson did not specifically reference Code § 19.2-271.6, he did argue that there was a lack of malice, and he proffered the instruction on voluntary manslaughter. *See Commonwealth v. Cary*, 271 Va. 87, 98 (2006) (finding that proffering a correct instruction on an issue "is sufficient to preserve for appeal the question whether the trial court erred in refusing that instruction"). Thus, we assume without deciding that the issue was properly preserved.

Nothing in the record supports a voluntary manslaughter instruction because there is no evidence that Anderson was provoked into a heat of passion. There is no evidence that Ozgur took any action to provoke Anderson. He simply had the misfortune to open the door of the restaurant as Anderson and his accomplice were fleeing the scene of the crime. Even if Ozgur did get in the way as Anderson fled the scene, nothing Ozgur did constitutes a *reasonable* provocation under the circumstances.

Anderson argues that Code § 19.2-271.6 adds a subjective component to the analysis because it allows evidence "concerning the defendant's mental condition at the time of the alleged offense" to show the "defendant did not have the intent required for the offense charged." Code § 19.2-271.6(B). Even if this argument were correct, it would not change the outcome in this case. Our case law makes clear that the victim, here Ozgur, must be the person that provoked the incident to support a heat of passion instruction. *See Arnold*, 37 Va. App. at 789. But the evidence here establishes that it was Anderson that provoked the incident in this case by participating in an armed theft and fleeing the scene of a crime. *See Barnes v. Commonwealth*, 234 Va. 130, 136 (1987) (holding that "as a matter of law, that one who, armed with a deadly weapon, approaches others intending to rob them, will not be heard to assert that he was provoked by the resistance of his victims to his criminal enterprise"); *Jordan v. Commonwealth*, 219 Va. 852, 855-56 (1979) ("A man cannot go a-gunning for an adversary and kill him on the first appearance of resistance, and rely upon the necessity of the killing as an excuse therefor." (quoting *Sims v. Commonwealth*, 134 Va. 736, 760 (1922))). He cannot now claim that Ozgur's actions, as he came innocently upon the scene of a robbery and crossed Anderson's path, constituted reasonable provocation. While Code § 19.2-271.6 may, in some circumstances, change the evaluation of what constitutes a reasonable provocation, it does not change the requirement that the situation cannot be one of the defendant's own making. We therefore find

that the evidence was not sufficient to support an instruction for voluntary manslaughter. Thus, the trial court did not abuse its discretion in refusing the instruction.

B. *Double Jeopardy—Aggravated Malicious Wounding and Murder*

Anderson argues that the trial court erred when it allowed him to be charged with both aggravated malicious wounding and the murder of Ozgur. He contends that his convictions for both offenses, which stem from a single gunshot, violates the Double Jeopardy Clause of the Fifth Amendment.

The Double Jeopardy Clause provides that no person "shall . . . for the same offence . . . be twice put in jeopardy of life or limb." U.S. Const. amend. V. "This constitutional guarantee provides protection against several forms of double jeopardy." *Severance v. Commonwealth*, 295 Va. 564, 572 (2018). Relevant here, the "prohibition against double jeopardy protects against 'multiple punishments for the same offense.'" *Id.* (quoting *Commonwealth v. Gregg*, 295 Va. 293, 298 (2018)). "We review *de novo* claims that multiple punishments have been imposed for the same offense in violation of the double jeopardy clause." *Holley v. Commonwealth*, 64 Va. App. 156, 160 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 227 (2013)).

Where, as here, a defendant is charged in a single-trial setting, "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Gregg*, 295 Va. at 298 (quoting *Blythe v. Commonwealth*, 222 Va. 722, 725 (1981)). In determining whether multiple punishments for a single transaction violates double jeopardy, "the controlling factor is legislative intent." *Id.* (quoting *Kelsoe v. Commonwealth*, 226 Va. 197, 199 (1983)). "The legislature 'may determine the appropriate "unit of prosecution" and set the penalty for separate violations.'" *Johnson v. Commonwealth*, 292 Va. 738, 741 (2016) (quoting *Jordan v. Commonwealth*, 2 Va. App. 590, 594 (1986)). "Where a legislature intends to impose multiple punishments for the

same course of conduct, the imposition of multiple punishments does not violate the Constitution." *Payne v. Commonwealth*, 52 Va. App. 120, 125 (2008). "It is judicial punishment in excess of legislative intent which offends the double jeopardy clause." *Johnson*, 292 Va. at 741 (quoting *Shears v. Commonwealth*, 23 Va. App. 394, 401 (1996)).

The first step is to "consider whether 'the legislative intent is clear from the face of the statute or the legislative history.'" *Andrews v. Commonwealth*, 280 Va. 231, 284 (2010). If legislative intent cannot be ascertained from the statute or legislative history, then the court applies the *Blockburger*[7] test, which "asks whether each statutory offense requires proof of a fact that the other does not." *Gregg*, 295 Va. at 298.

Anderson argues that the General Assembly "did not intend separate punishment[s] for murder and aggravated malicious wounding arising from a single gunshot."

But we have previously found that convictions for both aggravated malicious wounding under Code § 18.2-51.2 and second-degree murder under Code § 18.2-32 did not violate double jeopardy. *See Bomber v. Commonwealth*, No. 2451-11-3 (Va. Ct. App. Mar. 5, 2013).[8] In *Bomber*, there was a single criminal act of stabbing, which led to the two charges. *Id.*, slip op. at 2. Neither statute explicitly authorized multiple punishments. *Id.* at 4. Nor did either statute explicitly or implicitly *prohibit* multiple punishments. *Id.* Thus, we found that the legislative intent could not be ascertained from the statute or from the legislative history, and we applied the *Blockberger* test. *Id.* at 4-5.

Viewing the offenses in the abstract, we found that "second-degree murder and aggravated malicious wounding have distinct elements of proof." *Id.* at 5. While both offenses required proof

---

[7] *Blockburger v. United States*, 284 U.S. 299 (1932).

[8] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012).

of malice, they had no other elements in common. *Id.* Aggravated malicious wounding requires proof of stabbing, cutting, shooting, or other wound or injury, while murder can be accomplished by the same methods, "or others, such as poisoning, strangulation, and starvation." *Id.* Aggravated malicious wounding requires proof of the "intent to maim, disfigure, disable *or* kill." *Id.* (quoting Code § 18.2-51.2). Second-degree murder, however, does not require proof of any specific intent. Additionally, aggravated malicious wounding requires proof of "permanent and significant physical impairment," *id.* (quoting Code § 18.2-51.2), while murder requires proof of death. Thus, each offense had separate and distinct elements. We therefore found, albeit in an unpublished opinion, that "the legislature authorized separate punishments for these acts." *Id.* at 6. We reach the same conclusion now. Accordingly, we affirm Anderson's convictions for both aggravated malicious wounding and second-degree murder.[9]

## C. *Abduction*

Anderson was convicted of the robbery of Gonzalez's wallet and the attempted robbery of Jaramillo. He was also convicted of 17 counts of abduction for the individuals inside the restaurant.

---

[9] Anderson relies on *Gregg*, 295 Va. 293, to argue that the single gunshot in this case "compels a single offense." In *Gregg*, the Supreme Court considered whether a single gunshot into a car, killing the occupant, supported convictions for both common law involuntary manslaughter and statutory involuntary manslaughter. *Id.* at 296. It found that the General Assembly did not intend to permit simultaneous punishment for the offenses. *Id.* at 301. Although the Court did, as Anderson points out, find it relevant that both offenses involved the same mental state, same act, and same victim, that point does not help Anderson here because the statutes contain different language. In *Gregg*, the Court noted that the "General Assembly did not draw a distinction between species of involuntary manslaughter – both common law involuntary manslaughter and involuntary manslaughter under Code § 18.2-154 constitute one crime of involuntary manslaughter." *Id.* at 300. Nor did the statute contain additional language that would authorize multiple punishments. *Id.* at 301. Thus, the fact that that mental state, act, and victim were the same was particularly relevant. That is not the case here when the offenses are separate and distinct.

He argues that the trial court should have granted his motion to strike the abduction charges because the abductions were inherent in the robbery and attempted robbery convictions. We disagree.[10]

Under the Double Jeopardy Clause of the Fifth Amendment, a defendant "accused of abduction by detention and another crime involving restraint of the victim, both growing out of a continuing course of conduct," may be convicted of both offenses "only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime." *Swezey v. Commonwealth*, 77 Va. App. 809, 815 (2023) (quoting *Brown v. Commonwealth*, 230 Va. 310, 314 (1985)). But our case law contemplates a situation where the defendant is charged with two crimes against the same victim. *Clanton v. Commonwealth*, 53 Va. App. 561, 571 n.10 (2009) (en banc) (noting that the doctrine has no application where the defendant was not charged with a restraint crime against the victim of the abduction). "Double jeopardy is not implicated in the situation where a defendant is punished for two separate crimes, each against a different victim." *El-Shabazz v. Commonwealth*, No. 2685-10-2, slip op. at 2 (Va. Ct. App. Apr. 3, 2012).

In *Clanton*, the defendant was convicted of the abduction of an infant. *Clanton*, 53 Va. App. at 566. He was also convicted of multiple accounts of attempted robbery of various adults in the home at the time. *Id.* at 566 n.2. The defendant argued that the abduction of the infant "was incidental to attempted robbery and thus barred by double jeopardy." *Id.* at 571 n.10. We found, however, that double jeopardy did not apply under those facts because the defendant "was not charged with attempted robbery of the infant or any other crime involving restraint of

---

[10] In his final assignment of error, Anderson challenges each of his convictions for use of a firearm in the commission of an abduction. His argument is premised on this Court reversing each of his abduction charges. *See Jay v. Commonwealth*, 275 Va. 510, 527 (2008) ("Under the plain language of Code § 18.2-53.1, there can be no conviction for use or attempted use of a firearm when there has been no commission of one of the predicate offenses enumerated in that statute."). Because we affirm his abduction convictions, we likewise affirm his use of a firearm convictions.

the infant." *Id.*; *see also El-Shabazz*, slip op. at 3 (noting that the abduction is not incidental to the robbery where the victim of the abduction and the victim of the robbery are two separate persons); *Freeman v. Commonwealth*, No. 0818-13-2, slip op. at 5 n.5 (Va. Ct. App. Apr. 29, 2014) ("It logically follows that a detention of someone other than the victim of the detention-plus crime falls outside the scope of *Brown*. . . . Nor is it inherent in the crime of robbing one victim that someone else also be detained at the scene of the crime.").

Here, the "detention-plus" crimes were the robbery of Gonzalez and the attempted robbery of Jaramillo. Of Anderson's 17 abduction convictions, 1 involved Gonzales. The remaining 16 involved other patrons and employees in Denny's. Anderson was "not charged with [robbery,] attempted robbery . . . or any other crime involving restraint" of the 16 other individuals. *Clanton*, 53 Va. App. at 571 n.10. Therefore, the detention of those 16 individuals was not incidental to the robbery or attempted robbery offenses. Consequently, those 16 convictions are not barred by double jeopardy.

The abduction of Gonzalez is a separate question, as Anderson was also charged with a detention-plus crime against Gonzalez. Determining whether the detention of Gonzalez was the "kind of restraint which is an intrinsic element" of the robbery "is a question of law to be determined by the court." *Swezey*, 77 Va. App. at 815 (quoting *Lawlor*, 285 Va. at 229). "The only issue when abduction is charged alongside an offense for which detention is an intrinsic element is whether any detention exceeded the minimum necessary to complete the required elements of the other offense." *Lawlor*, 285 Va. at 225. Thus, we need to consider whether the evidence proves that the detention of Gonzalez exceeded the minimum necessary to complete the robbery. Some factors to consider are:

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the

> asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Hoyt v. Commonwealth*, 44 Va. App. 489, 494 (2004) (quoting *Gov't of V.I. v. Berry*, 604 F.2d 221, 227 (3d Cir. 1979)); *see Swezey*, 77 Va. App. at 817 ("[T]he *Lawlor* test is mandatory and consideration of the *Hoyt* factors is permissive.").

Here, we find that the detention of Gonzalez exceeded what was necessary to complete the robbery. The duration of the detention was only a few minutes, which is shorter than the detention considered incidental to a robbery in other cases. *See, e.g.*, *Wiggins v. Commonwealth*, 47 Va. App. 173, 176-77 (2005) (noting that the duration of the detention was only a few minutes). But the detention continued after the robbery was completed, as Anderson made Gonzalez stay under the table as Anderson continued to move around the restaurant. *See id.* at 189 (noting that the defendant "looked around a bit" before leaving the restaurant and a "reasonable factfinder could have concluded that the detention . . . lasted significantly longer" than other detentions); *Lawlor*, 285 Va. at 226 (Any "additional restraint, either as to duration or degree, is not inherent in [the detention-plus crime] and therefore is not an intrinsic element."). Then, Anderson and his partner also attempted to steal from the restaurant itself, and Anderson shot two other people in the restaurant, meaning the detention extended into separate offenses. Finally, after the robbery against Gonzalez was complete, witnesses testified that Anderson was getting angry and said he wanted to kill someone. He was waving the gun around at people, attempting to rob people, and he did in fact shoot two people. Thus, the prolonged detention exposed Gonzalez to significant danger independent of the robbery because the robbery was already complete. Thus, we find that the detention of Gonzalez exceeded the minimum necessary to complete the robbery. *Id.* Accordingly, we affirm his conviction for the abduction of Gonzalez.

D. *Motion to Correct Clerical Error*

Anderson filed a motion asking this Court to grant leave for the trial court to correct a clerical error in the sentencing order.  Anderson was convicted of many use of a firearm offenses.  At the sentencing hearing, the trial court ordered that each of these sentences be served concurrently.  The sentencing order lists the offenses to be served concurrently, but it does not include CR20001015-00, one of the use of a firearm offenses.  Nor was it included in the offenses to be served consecutively.  It appears that this was a clerical error, and we remand to the trial court for correction of the sentencing order.

## III. CONCLUSION

For the foregoing reasons, we find that the trial court did not err.  Therefore, we affirm Anderson's convictions.  We remand to the trial court, however, for correction of the sentencing order.

*Affirmed and remanded.*